Mel M. Marin                    15 Jul 2015
P.O. Box 1654
Hermitage, PA    16148

**FILED**
HARRISBURG, PA

AUG 0 7 2015

Plaintiff
*Pro Se*

MARIA E. ELKINS, CLERK
Per_____

# IN   THE   UNITED   STATES   DISTRICT   COURT

# FOR   THE   MIDDLE   DISTRICT   OF   PENNSYLVANIA

MEL   M.   MARIN,                          )        Civil 1:15-CV-1550
                                           )        Conner/ Carlson
Plaintiff,                                 )
                                           )        COMPLAINT
v.                                         )        FOR   DECLARATORY
                                           )        AND   INJUNCTIVE   RELIEF
THE   SECRETARY   OF   THE                 )        AND
COMMONWEALTH   OF                          )        FOR   DAMAGES
PENNSYLVANIA;                              )        FOR   VIOLATION   OF
AND                                        )        THE   CIVIL RIGHTS   LAWS
CHARLES   RICE;                            )        (28  U.S.C. § 1343; 42 U.S.C. § 1983 )
AND                                        )        AND
CHARLES   ANTHONY   PASCAL;                )        FOR   INTERFERENCE   WITH   CAREER
AND                                        )        AND
THE   SECRETARY   OF   THE                 )        FOR   DEFAMATION
COMMONWEALTH   BUREAU OF                   )
ELECTIONS;                                 )
AND                                        )        JURY   DEMANDED
WILLIAM   L.   MCCARRIER,                  )
A. DALE PINKERTON, JAMES                   )
ECKSTEIN,   SHARI A.   BREWER;             )
IN THEIR OFFICIAL AND                      )
INDIVIDUAL   CAPACITIES,                   )
JOINTLY   AND   SEVERALLY                  )
                                           )
Defendants.                                )

Plaintiff alleges as follows:

## JURISDICTION   AND   VENUE

1.   This court has jurisdiction under 28   U.S.C. § 1331 because of a federal question, to wit: violations of the 1st and 14th Amendments to the Constitution, and the Civil Rights Act at Title 42 United States Code, Section 1983.

2.   Venue is proper here because the first defendant is the SECRETARY of the state and actions against the SECRETARY and state statutes are properly commenced here.

3.   Any statutes of limitations that would have run to bar this action were equitably tolled by virtue of Mel's filing these same allegations in this court in 2014 as an amendment to his April 7, 2014 removal petition, and which this court declined to reach, the appeal from which the Third Circuit denied after the summer of 2014, under the rule in Berg v. Leason, 793 F.Supp. 903 (N.D.Cal. 1992), reversed, 32 F.3d 422 (entire period of case through last circuit stage tolls).

## PRELIMINARY   ALLEGATIONS

4.   Plaintiff Marin became a candidate for the Democratic Primary Election for Congress to be held on May 20, 2014 because he collected between the dates established by the state February 17 to March 10, 2014 nomination signatures of at least 1,160 voters in the congressional district which spans 7 counties and over 300,000 voters from North Pittsburgh to Lake Erie.

5.   By March 15, 2014 the state was able to declare that there were only two Democrats who had successfully collected over 1,000 nomination signatures to compete for that spot, and Mel was one of them.

6.   On March 18, 2014, defendants RICE, and PASCAL acting in concert and cooperation, caused a complaint to be filed in state court by ATTORNEY   PASCAL against Marin to challenge Marin's signatures and ask that Marin's name be removed on the basis of court precedent that did not exist, for the purpose of preventing Marin from continuing his campaign to force him to devote all of his time to litigation in courts to stay in the same race, thereby ensuring Marin could not win.

7.   The roles of the defendants were these: RICE used money provided by the National

Democratic Committee and raised from local Democrats, to pay for an attorney to harass Marin to punish Marin for executing his 1st Amendment right to run for public office because of the content of his speech, his "platform" as a moderate Democrat, by the filing of a law suit that had no lawful basis according to precedent at the time in order to destroy Marin's ability to campaign, and RICE reported false and defamatory information to local newspapers to damage Marin personally and professionally, and to use tricks in the state court that violate federal due process rights to kick Marin off the ballot like refusing to provide the correct basis for the challenge, refusing to mail Marin the complaint in time to act on it fairly, refusing to meet with Marin for two and one-half weeks out of the three weeks available for that meeting, misstating the   bases for the complaint in the public newspaper and in the complaint to mislead Marin as to the real reason so Mel could not fairly defend.

8.   Knowing it was a plan of unlawful harassment, RICE intentionally used that authority with ATTORNEY PASCAL to use the state court acting under color of state law as an administrative tool to conduct the harassment described above.   Knowing there was no legal basis for the complaint based on precedent at the time, PASCAL colluded with RICE and used state actors and offices (courts) to execute the unlawful harassment.

9.   PASCAL was personally liable for these unlawful actions because he knew at the time that they were unlawful, and lawyer immunity does not protect the lawyer who knew or should have known that he was helping his clients to take unlawful actions, as in Neibur v. Town of Cicero, 212 F.Supp. 2d 790, at p. 824 [64](N.D. Ill. 2002)(private attorney who was involved with actions of city officials that disregard the law is not shielded from law suit under 42 U.S.C. § 1983), Shifrin v. Wilson, 412 F.Supp. 1282, 1302 n. 23 (U.S. Court of Appeals for the District of Columbia Circuit 1976)(attorney has duty to public and not just the city, to give proper advice to the city that will not injure public and private persons have standing to sue the lawyer under 42 U.S.C. Section 1983) and Stevens v. Rivkin, 608 Federal Supplement 710, 730 [15](U.S. District Court for the Northern District of California 1984)(attorney who takes client and should know that client will continue to violate established federal rights is personally liable for future wrongs), and U.S. v. Olivas, No. 02-3353, 2003 WL 21384321 at * 3 (D. Kan. June 12, 2003)(only lawful acts are within the scope of representation of the lawyer), and Herring c. Chichester School Dist., civ. 06-5525, 2007 WL

3287400 at * 5 (E.D. Pa. Nov. 6, 2007)(Pa. law firm acts under color of state law when they conspire with government officials to deprive citizens of their civil rights, and the law firm may be liable if their conduct took place outside of the scope of representation of their clients).

10.   As part of this scheme, PASCAL filed a complaint against Marin that relies mainly on the claim that the *signatures* of the nominators were "in the hand of another", in order to misrepresent their objections and avoid telling Marin that they really intended to object to something else.   This is because the Pennsylvania Supreme Court ruled long ago that an attack against nomination papers that alleges "in the hand of another" constitutes an attack against signatures and nothing else, in Petition  of Bishop, 525   Pa. 199, 529 A.2d 860 (1990).

11.   PASCAL, in concert and cooperation with RICE deliberately intended to misrepresent in order to prevent Marin from preparing a defense to their charges by leading him down the wrong path.   That plan to win by deliberate intentional deceit in their first filing was improper according to the Supreme Court of Pennsylvania:

> [T]he allegations must set forth the specific grounds of invalidity so as to sufficiently advise the proposed candidate of the errors in his nomination petitions so that he is in a position to present any defense he may have to such allegations.

Petition of Bishop, 525 Pa. 199, 204 (1990).

12.   They also executed this plan using public statements made to the media after filing the March 18 complaint intending for Marin to read them and be misled.   In an explanation given to the Meadville newspaper about March 25, 2014 while they hid their complaint from Marin, RICE told the reporter and the reporter printed that the challenge was based on allegations that the same nominators signed several times.

13.   That representation was false and intended to hurt Marin in the public by an innuendo that plaintiff was committing a type of fraud on the public by passing off duplicate signatures.

14.   ATTORNEY  PASCAL admitted in the court record at state trial in March 2014, however, that the challenge was not about "duplicate signatures", and PASCAL informed the state court that they were "not proceeding" on the basis of any allegations of duplicate signatures.   Thus,

4

in his story to the newspaper RICE intended that Marin would see the misrepresentation and would base a defense on the wrong issue while they withheld the correct issue.    The admission is also conclusive proof that the innuendo of fraud of duplicate signatures was false and that the defendants knew when they made the representation to the paper that it was false.

15.   However, Mel was not allowed to investigate these false representations, nor to do to "discovery" about them by deposition or other means, nor to prosecute any claim against the cabal for the false representations because the state legislature did not give the state court the power to allow such claims, nor to raise and prove violations of constitutional rights.

16.   RICE made the false innuendo for the intended purpose of leading the public to shun Marin and not vote for Marin on the basis of the suggestion of a crime, and for the purpose of conditioning the state judge to remove Marin from the ballot and to damage Marin's reputation and stop his career.

17.   The defendants named in the caption except the SECRETARY OF THE COMMONWEALTH, acted in concert and cooperation with RICE to withhold the true basis of the complaint so Marin could not prepare a defense to the hidden basis of the complaint, and each defendant except the SECRETARY knew about the false representations in the complaint   by PASCAL and the false representation in the public newspaper by RICE, and could have corrected the misrepresentations by RICE and PASCAL but failed and refused   to do so in order to achieve a "litigation advantage" against Marin to win the challenge and remove Marin based on tricks and not merit, and intended to defame Marin in the public by the suggestion of fraud.

18.   Their misrepresentation worked.   Marin prepared a defense to prove their signatures were valid and that none were duplicates.   He spent his time seeking subpoenas of witnesses from state agencies that would show from driver records, and welfare and health records, that the signatures were all genuine.

19.   However, the state court refused to enforce those subpoenas so Mel could not produce any evidence from anyone, for two reasons.

20.   The first was that the state created fixed deadlines to resolve campaign challenges and those deadlines eliminated the ability of candidates to reach and state offices to produce the witnesses

and records Mel needed.

21.   The second was that even if the deadlines were not present so that the information could be collected over the period of months that was required, the court would not allow waiver of the costs of records from state government offices because of Mel's inability to pay them, even if he is declared indigent, so that only wealthy candidates could produce such evidence.   This constituted a violation of due process and equal protection because it is a state court policy of allowing a fixed payment scheme to weigh with unequal weight on indigent litigators which has been held to violate the constitution in Boddie v. Connecticut, 401 U.S. 371, 381, 91 S.Ct. 780, 787 , 28 L.Ed.2d 113, 121 (1971)(state rule that gives indigent litigators less rights than those who can pay and refusing to admit them to the court, is unconstitutional) and Belitskus v. Pizzingrill, 343 F.3d 632, 642, 644,   646 (3d Cir. 2003)(The challenged fee structure fell with unequal weight on voters as well as candidates, according to their economic status).

22.   So Marin moved out of his rented room in Sharon to use his rent money to pay for the cost of subpoenas and gas to Harrisburg to personally serve them.    Because Marin was thereby led on a goose-chase by the defendants, he was not able to be present in Western Pennsylvania to meet with opposing counsel in the final days before trial as the state court ordered.

23.   The defendants also refused to mail their complaint to Marin, and waited until he moved out of his room in Sharon to try to serve him in the rented room where he no longer lived, to   avoid giving Marin the complaint so he could prepare.    They had his mailing address at all times, but refused to mail a copy there until the state court ordered it.    By the time they mailed it and Marin was able to collect it, Marin had only 10 days before the trial set for the matter, and he spent the first of those five days trying to serve state agencies in Harrisburg in his defense.

24.   On Monday April 7 Marin filed a removal of the state action to this federal court on the grounds that the state complaint raised federal issues.   He then served the removal notice on the state court and on the defendants' lawyer PASCAL on April 8 and that removal had the effect a law, of extinguishing the state case because of the rule in Security Farms v. International Broth. of Teamsters, 124 F.3d 999 (9th Cir. 1997)(a state proceeding is extinguished by the removal to federal court).

25.   However, the state court decided to ignore the federal court removal, and started the trial anyway on Thursday April 10.

26.   Marin appeared at the trial in order to be careful and informed that court that he was not waiving his challenge to its jurisdiction by appearing, and Marin was informed by ATTORNEY PASCAL that PASCAL received the notice of federal removal days before, and the state judge informed Marin that they were ignoring the federal removal because they do not consider their state court challenge a "civil matter" subject to a federal removal.

27.   ATTORNEY PASCAL also informed the court that they were "dropping" Count II entirely which raised a federal law issue on residency of federal candidates, in an effort to prevent a good removal to federal court that Marin had already filed two days earlier.

28.   The state judge then quashed all of Marin's subpoenas so Marin had no witnesses or defense, although fundamental *federal* rights prevent that, according to   Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 1000 [2], 82 L.Ed. 1129 (1938) (failure to allow litigant discovery compels reversal).

29.   ATTORNEY PASCAL then informed Marin that they do not challenge the signatures at all, not one.   No do they allege duplicate signatures as defendant RICE reported to the Meadville newspaper.   Instead, they rely on the material printed in the boxes, as a violation of the state rule   25 P.S. § 2868, that requires all the printed boxes to be filled-in by the nominator and no one else.

30.   That was the first time, at trial on August 10, that the defendants stated what the actual basis was for their challenge.

31.   However, the state court already ruled over a decade earlier that printed material could be filled-in for nominators who were sick or "otherwise needed assistance":

> The Objectors also argue that the signers did not complete the required information in accordance with section 908 of the Election Code, 25 P.S. § 2868. However, as indicated above, federal law mandates that the rights of the disabled be preserved and facilitated.
> * * *
> Smith, being familiar with the signers, knew that they would have problems writing their addresses and occupations on the Nomination Petition, (Findings of Fact, Nos. 7-8); and (4) it was obviously difficult for many signers to write their own names

on the Nomination Petition, (Findings of Fact, No. 9). These findings support the trial court's conclusion that the signers required assistance "so as not to disenfranchise them from the electoral process."        Accordingly, we affirm.

Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth.   2003).

32.   And the same state court a decade earlier also ruled that in order for a challenger to object to printing, the challenger must allege in his *first* submission to the state court that *none* of the nominators were infirm or ill or otherwise needed assistance, and the failure to do so early waived the objection forever:

> The Objectors argue that the trial court erred in denying their petition to set aside Fitzpatrick's Nomination Petition because . . .   (4) **the signers were not disabled per se and did not request accommodation.   However, the Objectors failed to raise these issues within seven days of the last day for filing a nomination petition, as required** by section 977 of the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. § 2937. Therefore, these matters are waived.

Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth.   2003).

33.   But PASCAL and RICE did not make that allegation that they had given early notice.

34.   Because they did not did not make that allegation when they filed their   complaint on March 18, their initial filing was clearly against this rule, and they made a challenge that they knew was not warranted by existing law and are liable for deliberately abusing the court system based on the law at the time they took the action, according to the court in U.S. v. Baez, 744 F.3d 30, 35 (1st Cir. 2014) (government agent is liable for violation of a law based on case law precedent at the time he took the act, and not based on changes in the law after he acted because he could not know the future).

35.   Their goal, therefore, was not to prevail on the law because they knew they had no valid legal basis for objecting on the law.      Instead, their intent was to manipulate the court and the process and get Marin kicked-off the ballot by misrepresenting what the challenge was about so he could not create a defense, by refusing to send Marin the complaint they filed in time to act on it fairly, and by refusing to say they were not challenging signatures so Marin did not have to drive to Harrisburg.   In other words, they sent Marin on a goose-chase to Harrisburg to try to get witnesses to testify for a defense that did not exist because they were not actually challenging signatures.    They

did this trick so that they could tell the court later that Marin was in Harrisburg and not available in Western Pennsylvania to meet with ATTORNEY PASCAL on April 8.

36.   Because of this trick, and because RICE failed to appear for trial, they also violated the fundamental federal rule entitling an accused to confront his accusers, and Marin moved to dismiss the trial in part, on the basis of   Chambers   v.   Mississippi, 410 U.S. 284, 203, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)("few rights are more fundamental than that of an accused to present witnesses in his own defense").   He was denied.

37.   To punish Marin for being in Harrisburg filing the removal to federal court and not in Western Pennsylvania to meet with ATTORNEY PASCAL every day like a waiting lap-dog for weeks, the state judge refused to follow its own precedent from Petition to Set Aside Nomination of Fitzpatrick, and "relieved" the   defendants without their asking for that help of the requirement to make the proper allegation in their first filing, and ruled that 60 nominators that Marin needed to reach the required 1,000 would not be counted; and because the judge did not believe that there were 60 sick voters anywhere in the seven counties of 300,000 voters who needed help printing, because disabled voters *only live in nursing homes* and there are no disabled voters who do not live in nursing homes.

38.   And because the court quashed all of Marin's subpoenas, Mel had no witnesses or evidence to prove they were sick, and the state court ordered Marin removed from the election for failure to collect printed material of 1,000 voters who were not disabled.

39.   Additionally, during that same 2014 election the election offices of Erie and Mercer refused to provide current voter paper walking lists to plaintiff until March 2014 when the state declares him a candidate, and that restriction made campaigning in those counties meaningless because it is impossible to walk to at least 45,000 houses in the last 2 months before the primary election to collect that number of votes to win any primary in this district in the last century.   Those offices   intended it to make campaigning meaningless, to prevent new candidates from challenging local favorites.

40.   Additionally, the Butler County elections office and BUTLER COUNTY COMMISSIONERS refused Mel's request for a free voter list in 2014 whether the state certifies him

in March or not.   They did this pursuant to a long-standing and continuing policy of permitting only the wealthy who are their favorites to run for office in Butler County, intending to bar indigent or unknowns from a meaningful attempt to run for Congress, in violation of the 1st and 14th Amendments to the Constitution of the United States, as in Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 2445 at [8], 41 L.Ed.2d 341 (1974)(a state may not give indigent parties a "meaningless ritual" while allowing paying parties a meaningful appeal without depriving them of procedural rights under the 14th Amendment), and Folkers v. City of Waterloo, Iowa,   582 F.Supp.2d 1141, 1153 [13] (N.D. Iowa 2008)("There is no "one size fits all" formula for what process is due in all circumstances. . . The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner.").

41.   The same county offices repeated their same restrictions again this year, despite oral and written requests from Mel for those lists on May 5, 2015, May 18, 2015, and June 2, 2015, and the requests were refused or ignored.

42.   Mel also sent a letter on June 12, 2015 demanding that the defendant ELECTIONS SECRETARY   direct those offices to provide those lists without cost at once, so as to make the campaign effort meaningful, and the SECRETARY ignored the letter asking for the same, thereby acquiescing-in or allowing the county offices to continue their process which creates meaningless runs for office by the indigent.

# FIRST   CLAIM   FOR
## DECLARATORY   JUDGMENT   AGAINST
## THE   STATE   PROCEEDING   AND   JUDGMENT   OF   APRIL 10,   2014
## AGAINST   THE   2014 STATE   NOMINATION   CHALLENGE
## AND   FOR   PROSPECTIVE   INJUNCTIVE   RELIEF   FOR   THE   2016   RACE
## BECAUSE   OF   REMOVAL   TO   FEDERAL   COURT

43.   Marin hereby incorporates all prior allegations into this one.

44.   This court has the power to grant this relief under the rule in State Auto Ins. Companies

v. Summy, 234 F. 3d 131 (3rd Cir.  2000)("The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

2202, provides . . . that a court "may declare the rights ... of any interested party" ), and Africa v.

Anderson, 510 F.Supp. 28, 30 [1](E.D. Pa. 1980)(state judge is not immune from declaratory

judgment action under Section 1983), and Republican Party of North Carolina v. Hunt, 94-1057,

1113, 27 F.3d 563 [table], 1994 WL 265955 (4th Cir. June 17, 1994)(preliminary injunction granted to

require the state to move the deadline for superior court judicial candidates to be placed on the ballot,

even though the federal court could stop the General Election entirely and order a Special Election

after a full trial, because waiting for a full trial   with "deliberate investigation" before ruling would

still "disenfranchise for yet another year" the judges).


### Removal   Was   Proper   And   Complete   By   April   8

45.   Marin was properly on the ballot for the May 20, 2014 Primary Election on March 15,

2014.  Although a challenge was filed in state court against Marin's placement on the ballot, Marin

removed that challenge to this court on April 7, 2014, which was effective when Marin gave notice to

the state court on April 8, 2014 and which the opposing party also received through his attorney on

the same day, as in   Schultz , Inc. Glidden Co., 275 F,Supp. 955 (N.D. Ga. 1967) (any paper that

informs opposite party that action was removed is enough notice of removal).


### Removal   Made   The April   10   State   Trial   Void

46.   The effect of the removal was to extinguish the state court action completely, ending any

duty Marin may have had to meet with opposing counsel on the other side of Pennsylvania on August

8,   under the rule in United States ex rel. Walker v. Gunn, 511 F. 2d 1024, 1025 (9th Cir. 1975 )("his

removal petition had divested the state court of jurisdiction until a remand was ordered, and that since

no remand order had ever been issued the state court proceedings were null and void").

47.   It also made the subsequent state trial and judgment on April 10 void, according to Kalb

v. Feuerstein, 308 U.S. 433, 438, 60 S.Ct. 343, 346, 84   L.Ed.2d 370 (1940)(court judgment issued

over which it had no authority "was beyond its power, void, and subject to collateral attack").

48.   And the parties "going forward" in that trial could not give it jurisdiction it did not have

according to <u>Attorneys Trust v. Videotape Computer Products</u>, 93 F.3d 593, 595 [1](9th Cir. 1996) (party participating in a court trial cannot give it jurisdiction that it does not have).

49.   Additionally, ATTORNEY   PASCAL's "dropping" of Count II on April 10, 2014 to avoid a basis for federal removal was irrelevant because the date the court must use to determine if the removal   was proper is the date it was filed in federal court on April 7, 2014 and the opposing party's latter effort to sabotage removal does not matter, according to <u>Krangel v. Crown</u>, 791 F.Supp. 1436 (S.D. Cal. 1992); <u>Brown v. Eastern States Corp.</u>, 181 F.2d 26, 28 (4th Cir. 1950)(post-removal attempt to drop claim that involves federal question do not affect the validity of the removal and cannot cause a remand).

**The State Court's   Refusal To Recognize   The   Removal    Was    Void**

50.   Although the state court ruled on April 10, 2014 that it was ignoring the removal because it is not a   civil proceeding, that order too, was void for the same reason that it had no jurisdiction to make such an order.

51.   Moreover, the state judge's conclusion was also wrong, because the removal statute applies to both court trials or administrative trials no matter what the state calls it whenever it has the elements of a trial, including (1) by a private party rather than a government unit, (2) in an adversarial setting, (3) using any form of pleading   and answer format, according to the federal courts in <u>Mitchum   v. Foster</u>, 407 US 225, 234, 92 S. Ct. 2151, 32 L. Ed. 2d 705,   n. 12 (1972)(the removal statute applies to any state proceeding, civil or criminal),   <u>In re Halo Wireless, Inc.</u>, 11-42464-btr-11, 2012 WL 1190722 (E.D. Ky. Apr. 9, 2012) at * 2 (such an action is a civil action where there are "adversary parties and an issue in which the claim of one of the parties against the other, . .  is stated and answered in some form of pleading, and is to be determined",   following   <u>Comm'rs of Rd. Improvement Dist. No. 2 v. St. Louis Sw. Ry.</u>, 257 U.S. 547, 557 (1922)), and <u>BellSouth Telecomms.</u>, 11-4-8,   2012 Bankr. LEXIS 867, at * 4, 2012 WL 719703 (Bankr. E.D.N.C. March 5, 2012)(even though complaint was filed in an administrative commission, because it resembled a judicial matter,   including allowing parties to be heard through counsel, and to call witnesses at proceedings, and to "make requests for discovery", these were not "simply administrative concerns"

and it was not an exception to the removal statute as an administrative action).

52.   The basic structure of that election challenge here on April 7, 2014 was the same as above: private party allegations, adversarial setting, some form of formal pleading.

53.   And Marin's efforts in state court to serve subpoenas and object to the proceedings were not a waiver of  the right of removal, since his preliminary steps in state court before removal do not waive his right to remove according to Markantonatos v. Maryland Drydock Co., 110 F.Supp. 862 (S.D. N.Y. 1953)(seeking and serving subpoenas does not waive removal right), and Stuart v. United Ben. Life Ins. Co., 2 F.Supp. 641 (D.N.C. 1933)(filing demurrer in state court does not waive right to remove).

54.   And even if the state court could be found now to have had some jurisdiction or if the removal to federal court could be found now to have *not* ended that state court's power to act, the proceedings and rulings of that court *still could not* be given full faith and credit under rules of comity and this court cannot rely on those rulings now because constitutional procedural safeguards were disregarded by that court and fundamental federal rights cannot be truncated or denied by state legislatures, under the rule in Texaco Inc. v. Pennzoil Co., 784 F.2d 1133, 1144 (2d Cir. 1986)(*res-judicata* does not apply where Texaco did not have a "fair opportunity to seek and obtain a timely resolution" in the state court); and In re Heritage Hotel Partnership I, 160 B.R. 374, 377 [3][7](9th Cir. 1993)(*res judicata* does not bar claims which could not have been raised in the prior action) and Ehlers v. City of Decatur, 614 F. 2d 54 (5th Cir. 1980)(state court rules may not limit federal rights that federal courts could not limit).

55.   Therefore, the removal of Mel's name from the ballot in 2014 was improper and violated the 1st and 14th Amendments to the Constitution of the United States and the Civil Rights Act, and that made post-April 7 2014 congressional primary and general elections void; and this court hs the right to make that declaration.


**Marin   Is   Entitled   To   A   Special   Election   Or   Injunction   For   2016**

56.   Given this, Mel is entitled to a declaratory judgment finding those elections void and directing the state ELECTIONS SECRETARY to declare the 2014 congressional elections void and

to order a special election, or a prospective injunction directing the SECRETARY to certify Marin at once as a candidate for the 2016 congressional Democratic primary without being forced to collect new nominator names by petition as he did in 2014 since he did it once already and the objections to his 2014 list were improperly made and untimely interposed in that challenge, making those objections void, or that the objections themselves were violative of the 1st and 14th Amendments to the Constitution of the United States, under the rule in _Council of Alternative Political Parties v. Hooks_, 121 F.3d 876, 883 n. 7 (3rd Cir. 1997)(the harm to the plaintiffs by refusing to put their names on the ballot just before the election is greater than the "confusion and disarray" to the state's political process already underway), _Norman v. Reed_, 502 U.S. 279, 287, 112 S.Ct. 698, 704, 116 L.Ed.2d 711 (1992)(reversing Illinois State Supreme Court's refusal to put a slate of candidates on ballot two weeks before the election), _Rockefeller v. Powers_, 78 F.3d 44, 46   (2nd Cir. 1996)(NY election law that requires 1,250 Republican signatures per district to get on the presidential ballot is a "substantial burden" and is excessive and, therefore, violates the 1st Amendment because an alternate scheme of collecting .5% of the voters in each district is enough to meet the state goal of showing "substantial support" for   candidates, and requires the state put the Republican on the ballot 3 weeks before the election date), _Bullock v. Carter_, 405 U.S. 134, 136, 92 S.Ct. 849, 852, 31 L.Ed.2d 92 (1972)(because Texas filing fee to run for office was correctly declared by the federal district court to be unconstitutionally high as violative of the Equal Protection Clause of the 14th Amendment as to a class of poor candidates, the petitioners who could not afford to pay were properly ordered to be put on the ballot even though the   election was less than 4 weeks away, and _Republican Party of North Carolina v. Hunt_, 94-1057, 1113, 27 F.3d 563 [table], 1994 WL 265955 (4th Cir. June 17, 1994)(preliminary injunction granted to require the state to move the deadline for superior court judicial candidates to be placed on the ballot, even though the federal court could stop the General Election entirely and order a Special Election after a full trial, because waiting for a full trial   with "deliberate investigation" before ruling would still "disenfranchise for yet another year" the judges).

## SECOND   CLAIM   FOR
## DECLARATORY   JUDGMENT
## FOR   VIOLATION OF   THE   CIVIL RIGHTS   ACT
## AGAINST THE   SECRETARY   OF   THE   COMMONWEALTH
## AND   AGAINST   STATE   NOMINATION   RULES
## FOR   DENIAL   OF   FUNDAMENTAL   TRIAL   RIGHTS

57.   Marin hereby incorporates all prior allegations into this one.

58.   The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

59.   Title 28 Section 1343(a)(4) gives a second independent basis of jurisdiction for the same relief, pursuant to Lynch v. Household Finance Corp., 405 U.S. 538, 548, 92 S.Ct. 1113, 1120, 31 L.Ed.2d 424 (1972).

60.   State judges are not immune from a declaratory judgment finding that they enforced unconstitutional state laws, according to Mitchum v. Foster, 407 U.S. 225 (1972)(Section 1983 action permitted to pierce judicial immunity against state judge), Gertsein v. Pugh, 420 U.S. 103 (1975)(judgment against state judges),   Person v. Association of the Bar of New York, 554 F.2d 534, 536 (2nd Cir. 1977) (motion to dismiss dispute against Court and its Chief Justice as an enforcer of challenged State Bar rules, properly denied), and Africa v. Anderson, 510 F.Supp. 28, 30 [1](E.D. Pa. 1980)(state judge is not immune from declaratory judgment action under Section 1983).

61.   Neither are state officers, according to Gittlemacker v. Prasse, 428 F. 2d 1, 6 (3rd Cir. 1970).

62.   The SECRETARY OF THE COMMONWEALTH, and the COMMONWEALTH and the state judge in this state nomination case, unlawfully deprived Marin of the following rights and

privileges under color of state law in executing the state statutes at issue:

### The List Of Constitutional Offenses

a.  From March 18, 2014 to April 14, they enforced state elections statutes 25 P.S. §§ 2868 and 2937 that had already been held to be unconstitutional in Morrill v. Weaver, 224 F.Supp.2d 882 (E.D.Pa.2002), and Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth.  2003), and Campbell v. Davidson, 233 F3d 129, 1235 (10th Cir. 2000) (Colorado's rule requiring that candidates be registered voters in the district is unconstitutional), and Tex. Democratic Party v. Benkiser, 458 F.3d 582, 589 [10](5th Cir. 2006)(Tom DeLay is not ineligible to run for Congress or be a congressman because he moved his residency to another state because the qualifications listed in the Qualifications Clause of the Constitution for Congress "may not be changed or expanded in any way by the states"), because they conflict with Article I §2 of the U.S. Constitution, which requires candidates for federal office have a residence, report the residence, and be registered voters in the state.   The state court did this by failing to strike Count II of the Objector's challenge to Marin's   nomination, which sought Marin's disqualification for failure to have a local residence.

b.  The state court enforced the same residency statutes intending to punish Marin for not having a local residence, by permitting the defendants in the election challenge against Marin on March 19, 2014 in an order to the Objector to serve Marin only at his "residence" when the SECRETARY and the judge and the Objector had Marin's mailing address which was different; and refused to send the challenge to that address to make sure he could not receive it until two weeks had passed out of the 3 weeks that the state allows for challenges of this type, knowing that neither he nor anyone else could prepare a fair defense with one week to go before trial.

c.  On about March 28, the state court denied Marin the right to proceed *in forma pauperis* to prevent him from waiving the subpoena and service and collection fees to subpoena state witnesses with evidence he needed for his defense; on the basis that he was so poor that he did not make enough money to file tax returns and only someone wealthy enough to file tax returns could seek to waive court fees.   This barred Marin from even moving to proceed IFP thereafter until he ceases to live below the poverty level and produces past tax returns that do not exist, in violation of the   Equal Protection Clause of the 14th Amendment according to Bullock v. Carter, 405 U.S. 134, 136, 92 S.Ct. 849, 852, 31   L.Ed.2d 92 (1972)(the Texas filing fee to run for office was correctly declared by the federal   district court to be unconstitutionally high as violative of the Equal Protection Clause of the 14th Amendment as to a class of poor candidates), and Boddie v. Connecticut, 401 U.S. 371, 381, 91 S.Ct. 780, 787 , 28 L.Ed.2d 113, 121 (1971)(state rule that gives indigent litigators less rights than those who can pay and refusing to admit them to the court, is unconstitutional) and   Johnson v. Del. County, 34 Pa. D. & C. 23 (1938)(state rule requiring an indigent candidate to pay a $20 candidate fee when township candidate filing fees were only $2, was unconstitutional).

d.  On April 10, the state court denied Marin's request for a jury because the state legislators did not allow enough time to give one, in violation of the state constitution at Article I, Section 6 which provides that the right shall be "inviolate", and they did so knowing that a state

legislature may not amend the state constitution any more than the Congress can amend the U.S. Constitution.    The denial of that state right to a jury created a federal due process right to have that state right followed, under the rule in <u>Carlo v. City of Chino</u>, 105 F.3d 493, 495 [4](9th Cir. 1997)(state statute which mandates a process that is due when denied, can establish a violation of due process under the 14th Amendment of the U.S. Constitution and form the basis for a claim under the Civil Rights Act).

e.    On April 10 the state court punished Marin for traveling to Harrisburg on April 7 and 8 to file a removal into federal court, by ruling that Marin would be denied the right to present evidence in his own defense because he went to Harrisburg and filed the federal removal rather than sit in Western Pennsylvania to wait until opposing counsel was ready on April 8 to "meet-and-confer", thereby executing a punishment after the state court lost jurisdiction to proceed and violating due process by punishing Marin for filing of a federal action which he had a right to  do under the 1st Amendment, under the rule in <u>Bordenkircher v. Hayes</u> 434 U.S. 357, 363,  98 S.Ct. 633, 668 [3], 54 L.Ed.2d 604 (1978)  ("Penalizing a person for doing what the law plainly allows him to do is violation of due process of the most basic sort.").

f.    On April 10 the state judge also quashed all of Marin's subpoenas and informed him any evidence he submits would be for a record only, but would be barred from consideration, as part of the punishment for his filing the federal removal in Harrisburg, in violation of fundamental federal rights according to <u>Chambers   v.   Mississippi</u>, 410 U.S. 284, 203, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)("few rights are more fundamental than that of an accused to present witnesses in his own defense") and <u>Morgan v. United States</u>, 304 U.S. 1, 58 S.Ct. 999, 1000 [2], 82 L.Ed. 1129 (1938) (failure to allow litigant discovery compels reversal).

g.    On April 10 after the Objector's attorney admitted that their initial filing of reasons for the objection was based on bad or duplicate signatures and that they actually had no objection to the signatures but only to the printing of voter's addresses in boxes, the state judge relieved the Objector of waiver for failing to give the correct basis for challenge in the initial filing as required by section 977 of the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. § 2937 and enforced by the same court in <u>Petition to Set Aside Nomination of Fitzpatrick</u>, 822 A.2d 867, 870 (Pa. Cmwlth. 2003).   Because the judge relieved the Objector of that waiver without a motion for such relief by the Objector's lawyer, the ruling was ultra vires the power of the judge and voided that judge's authority to act in that proceeding thereafter, under the rule in <u>Collins v. Experian Credit Reporting Serv.</u>, No. 3:04CV1905, 2004 U.S. Dist. LEXIS 26345, at * 7 (D. Conn. Aug. 24, 2005)(if the court finds information to help a party that a party could assert but did not, he acts as a party's advocate, and not as an impartial adjudicator); <u>Khan v. Gutsgell</u>, 55 S.W.3d 440, 441 n. 1 (Mo. App. 2001)(a court as an impartial arbiter cannot be an advocate for a party that declines to argue its own issues).

h.    On April 10 the state judge continued with the case despite Marin's objections and motion to dismiss, and without requiring the Plaintiff/Objector RICE to appear and take any oath, or verify any allegations, nor submit to questions from Marin as is a required and fundamental federal right under <u>Crawford v. Washington</u>, 541 U.S. 36, 51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004)(right to confront accuser under the 6th Amendment bars the admissibility of  statements made by accuser without allowing examination on the stand), <u>In re Tellez</u>,

09-4461, 2011 WL 1226106 at * 1   (Bankr. M.D. Fla. March 30, 2011) (court entered judgment against plaintiff for failure to attend his own trial), and Weiler v. State, 95API11-1419, 1996 WL 257464 at * 2   (Oh. Ct. App. May 14, 1996)(dismissal for failure of plaintiff for failure to prosecute, including failure to attend   his own trial).

h.   On April 10 the Commonwealth Court's refusal to dismiss the challenge after the Objector admitted to giving false reasons for the objection in the initial filing was a violation of Marin's due process right to rely on the precedent for election rules according to Metric Const. Co. Inc. v. U.S., 83 Fed. Cl. 446, 451 (2008)(parties are entitled to rely on precedent in their actions) and Briscoe v. Kusper, 435 F.2d 1046, 1055-57  (7th Cir. 1970)(state nomination petition process that invalidates signatures for failing to include middle initial was a failure to give advance notice of the change in regulations to candidates of interpretation of law that qualified voters must sign in their proper persons only, and constituted denial of due process ).

i.   On April 14, the court failed to follow its own rule set forth in Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth.   2003) that held that a candidate may print boxes of the nomination form for persons who are infirm or in need of assistance, by ruling on April 14, 2014 that in a district of 300,000 voters only 12 are allowed to be sick and to have their boxes printed for them *because they live in nursing homes*, but not another 60 who were disabled and lived at home that Marin needed to reach 1,000 good signatures, and disregarding the only evidence on the record from Marin by his testimony that they were sick or in need of assistance, thereby making the ruling arbitrary because it fails to rely on the only evidence submitted, as in O'Keefe's inc. v. U.S. Consumer Product Saftey Com'n., 92 F.3d 940 (9th Cir. 1996)(an agency decision is arbitrary and capricious if the agency . . . offers explanation that runs counter to evidence before the agency), and  Post v. Hartford Ins. Co., 501 F.3d 154, 170 (3rd Cir. 2007)(dissent: the standard for review of an administrative agency action is arbitrary or capricious, and the court must limit itself to the evidence used by the agency); and because it creates a new rule against Marin alone opposite to precedent without prior notice, as required by Briscoe v. Kusper, 435 F.2d 1046, 1055-57 (7th Cir. 1970)(state nomination petition process that invalidates signatures for failing to include middle initial was a failure to give advance notice of the change in regulations to candidates of interpretation of law that qualified voters must sign in their proper persons only, and constituted denial of due process ).

j.   On April 14, 2014 the court relied on the same state statutes that limit the 1st Amendment rights of voters in the district to have their nomination count, by requiring that all nominators *print* their own addresses and dates in the boxes not because it is necessary for identification but solely because it is "something extra" the state legislators wanted to add for no particular reason, in violation of the federal rule that prevents intrusions on the exercise of the 1st Amendment right to vote unless they are *both* in a compelling state interest and narrowly tailored to avoid restricting more than is necessary, according to  Lawrence v. Texas, 539 U.S. 558, 593, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003)("substantive due process "prohibits States from infringing fundamental liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest").

k   The state court executed a procedure that allows the challenging party to register for and see all pleadings and orders on the computer without the cost of coming to Harrisburg, but

refused to allow Marin the same right when he made application for that service from March 25 to April 7, 2014 on the excuse that a candidate's application for that service has no greater priority than that of any other litigant although state law says the opposite, and when Marin raised it with the court clerk on April 2, they refused to follow their own rule that requires candidate's proceedings have priority over all other court matters in 25 P.S. § 2937 ("precedence over other business before it"), and that forced Marin to stop   campaigning completely to travel to Harrisburg just to look at what was in the file.

### The   State's   Excuses   For   Cutting   Off   Fundamental   Federal   Rights

63.   The state actors and laws removed or disregarded these constitutional and fundamental federal rights according to the state Supreme Court because the state legislators did not want candidates to have normal due process rights but only rights less than are permitted to convicted felons, according to   In re Johnson, 509 Pa. 347, 502 A,2d 142   (1985) (rules of civil   procedure are not to be used in nomination challenges because the legislature did not say so).

64.   In effect, therefore, the state legislature made all candidates for public office second class citizens, eliminating fundamental federal constitutional rights entirely, because they "felt like it".

65.   Because "feeling like it" is not a compelling state interest that justifies truncating 1st and 14th Amendment rights, their motive was unlawful, according to Morrisey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (a legislature cannot ignore constitutional rights entirely, especially those based on the 1st Amendment), and Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (state poll tax unconstitutional   because it discriminates against the poor who cannot pay it as a qualification to vote), and   Giaccio v. State of Pa., 382 U.S. 399, 402, 86 S.Ct. 518, 520, 15 L.Ed.2d 447 (1966) ("both liberty and property are specifically protected by the 14th Amendment against any state deprivation which does not meet standards of due process, and such protection is not to be avoided by the simple label that the state chooses to fasten upon . . . its statute").

66.   Moreover, that excuse is not even legitimate under a "rational- basis" standard because "feeling like" eliminating fundamental federal rights is a whim, and a whim is capricious and capricious is afoul of the "easy" rational-basis standard according to   Reed v. State Farm Mut. Auto. Ins. Co., 857 So. 2d 1012, 1021 n. 7 (La. 2003)(an arbitrary or capricious act is one based on whim)

and Arnold v. State, 236 Ga. 534, 541, 224 S. E. 2d 386, 391 (1976)(the application of a right that turns on the whim of a jury violates the constitution).

67.   At best, it could be argued to be based on a lack of time to give the full rights guaranteed by state and federal laws, based on the state judge's statement on April 10 that "we don't have time" for it.

68.   However, the rights of candidates like Marin were truncated deliberately and unlawfully by legislators already in office for the purpose who could have easily set deadlines earlier.   Instead, they deliberately wait every election cycle as they have for decades until the last minute to eliminate time required for state trials that carry procedural rights the constitution mandates, to make it impossible for challengers to fairly challenge the seats of those in power, as suggested by the Supreme Court in   Clingman v. Beaver, 544 U.S. 581, 125 S.Ct. 2029, 2044, 161 L.Ed.2d 920 (2005) (O'Conner, J., concurring)("the State may not be a 'wholly independent or neutral arbiter' as it is controlled by the political parties in power, 'which presumably have an incentive to shape the rules of the electoral game to their own benefit'.").

69.   Thus, because these restrictions against 1st and 14th Amendment procedural rights are not narrowly tailored and are totally unnecessary, the nomination challenge and ruling here are void.

**The 21 Day Nomination Window Is Unconstitutional As A Severe Burden On The   Indigent**

70.   In further support of this ultimate finding, Mel also alleges that courts have routinely ruled   that truncating or moving election phases in a way that makes campaigning meaningless or will not be taken seriously by the voters, is enough to strike down the state's election schedule as violative of the 1st Amendment, and it does not matter that the candidate is not in a commonly recognized suspect class like race, because *campaigners* of any ilk are to be protected with strict scrutiny according to Burdick v. Takushi, 504 U.S. 428, 438-42, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)(an election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest), and McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1955)(the communication of petitioners to voters is the most highly protected speech and can be restricted only by means

"narrowly tailored to serve and overriding state interest"), and <u>Williams v. Rhodes</u>, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)("the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." ), <u>Mandel v. Bradley</u>, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (severe burden on Independent candidates).

71.   And this same 21 day rule was already held to be unconstitutional as to new parties when an independent party challenged it because a new party does not have the name-recognition nor the wealth of the established parties and requires more time for petition collections for nominations, in   <u>Peoples Party v. Tucker</u>, 347 F. Supp. 1 (M.D. Pa. 1972)("We conclude that this three-week period is so short and so remote from the election as to be unreasonable. We have been unable to ascertain any valid purpose to be served by it.").

72.   It was held to be unconstitutional *again*, as against independents in <u>Tucker v. Salera</u>, 399 F. Supp. 1258 (ED Pa. 1975), <u>affirmed</u>, 424 U. S. 959 (1976) when combined with other restrictions because independents needed more time than 21 days.

73.   Because that <u>Salera</u> district court order was not entirely clear, the Supreme Court clarified in <u>Mandel v. Bradley</u>, that the 21 day deadline *was* a separate basis for ruling against the Pennsylvania law:

> There, in addition to the early filing date, signatures had to be gathered within a 21-day period. This limited time enormously increased the difficulty of obtaining the number of signatures necessary to qualify as an independent candidate.[2] This combination of an early filing deadline and the 21-day limitation on signature gathering is sufficient to distinguish Salera from the case now before us, where there is no limitation on the period within which such signatures must be gathered.

<u>Mandel v. Bradley</u>, <u>supra</u>, at 176, 2240 (1977).

74.   But the 21 day nomination deadline is just as severe and destructive to indigent candidates like Mel because they cannot pay for teams of people to canvass different areas at the same time to reach the required number of nominators as the wealthy, incumbents can.   Here is why:

75.   The legislature only permits the 21 days to be squarely in the middle of the snow season from mid-February to March when travel is often dangerous for half of those days, and one day must be spent in travel to Harrisburg for a filing circus that takes a full day. This creates a realistic signature window of only 10 - 20 days.   Because hundreds in every nomination list is often held to be void because strokes, age, and mistakes that eliminate names, the real list must be over 1,500 in order to make a safe filing of 1,000 required names.

76.   Because petitioner had no money in 2014 to pay for canvassing help as those already in office, he had to collect the signatures himself.   But the ruling of the state judge in this companion state case shows the state court will not count the nomination of more than 12 disabled voters out of 300,000 unless they are in nursing homes.   So that forces candidates to ignore the aged and infirm, disenfranchising all of them.

77.   And healthy residents are employed during the day and are only home after 6pm and they do not open the door after 7pm when it is dark during daylight savings time.   So neither this candidate nor any one else can collect more than 6 signatures an hour alone, because many houses are not occupied in this district at all.   That means 6 signatures a day during the week, and triple that during week-end days.   The total a poor person can collect by himself is about 90 a week including the week-ends if there are no snow blocks.   This record is based on actual experience of the plaintiff in 2012 and 2014.

78.   In the best season with no snow at all, therefore, the most that can be collected from 6-7pm in 20 potential days is 270 names.     That is far less than what is necessary.   So just being poor ends it.   It is for that   reason that every election year over a dozen Democrats announce or collect voter roles for campaigning, and only a few who pay others for canvassing help make the primary election.   Storer v. Brown, 415 US 724, 742, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974)(past experience showing parties and candidates being unable to meet the state's ballot-access requirements is a helpful guide in determining their constitutionality).

79.   Petitioner was forced, therefore, to go to those at home during working hours which means he often reaches the aged and disabled who could not leave their homes.   Many had trouble signing their names because they had strokes and diseases and they cannot travel to town to

re-register.    Many could not see the lines on the page and printed their names and addresses across the names of prior nominators, destroying entire pages.

80.    As a result, by walking all day in all days available in February and March, Mel was able to collect about 1,200 names in 2014, but hundreds could not see the lines to print or were exhausted just standing up to open the door and sign, and Mel helped some by putting his finger on the lines and they often signed onto his hand, and then Mel printed their addresses and dates for them as the court allowed in Fitzpatrick, supra, at 870 [1] (Pa. Cmwlth. 2003).

81.    In other words, because Mel is poor he *had* to ask the aged and disabled, whomever came to the door before 6pm, if they would nominate him.    The wealthy ignored them as threats to nomination.

82.    Because Mel's poverty prevents him from hiring a team of canvassers, a "one-size-fits-all" 21 day deadline is not meaningful.    It was a severe restriction, and violates due process as meaningless,    as well as violating the 1st Amendment as "severe", under the rule in Folkers v. City of Waterloo, Iowa,    582 F.Supp.2d 1141, 1153 [13]    (N.D. Iowa 2008)("There is no "one size fits all" formula for what process is due in all circumstances. . ."), and Mandel v. Bradley, supra, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (severe burden on Independent candidates).

83.    Courts have also held there is no justification for disparate or unequal treatment when the unequal treatment is against the poor even though indigency is not a suspect classification, because *anyone* disenfranchised is protected by strict scrutiny, as in Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)(state poll tax unconstitutional because it discriminates against the poor who cannot pay it as a qualification to vote), Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130    (1971)(a city ordinance violates the equal protection clause as to poor residents by a rule that allows them to automatically change a fine to a jail term solely because the defendant was poor and could not pay the fine because there are other means that could be used that do not punish indigency), and Johnson v. Del. County, 34 Pa. D. & C. 23 (1938)(state rule requiring an indigent Candidate to pay a $20 candidate fee when township candidate filing fees were only $2, was unconstitutional).

84.   Therefore, requiring a poor candidate to collect the same number of 1,000 nominators as the wealthy may have some redeeming state interest like forcing candidates to meet and talk with their voters.   But requiring them to pay for a team of 10 canvassers which they cannot afford in order to collect those signatures from 6-7pm as the wealthy candidates do, only punishes the *pauper* candidates and makes certain that the votes of his electors will not count because he must collect hundreds of signatures from the aged and disabled, to meet the 1,000 goal that the state requires. Therefore, the *process* the state employs by limiting the time to collect nominators so that only wealthy candidates who can pay for help can succeed, fails the strict scrutiny test required for voting.

85.   Additionally, no court has allowed a compromise with the "no residency" rule for candidates in the U.S. Constitution.   The state may not even make a "narrowly-tailored" amendment to it at all; not   to get service of process where the state wants it, and not to put "local favorites" into office.   Schaefer v. Townsend, 215 F. 3d 1031,   1036, 1039 (9th Cir.   2000) ("The Framers discussed and explicitly rejected any requirement of in-state residency before the election. The Records of the Federal Convention show that the Framers intended to preclude any further requirement of residency prior to the date of election. . . . we hold that because California's residency requirement as it applies to candidates for the United States House of   Representatives handicaps a class of candidates and falls outside the sphere of Elections Clause cases."),   Campbell v. Davidson, 233 F3d 129, 1235 (10th Cir. 2000)(Colorado's rule requiring that candidates be registered voters in the district is unconstitutional).   So, the state judge's order to the Objector to serve Mel only at his residence for a candidate challenge and not at his mailing address when the U.S. Constitution does not require a residence, and in the process destroying the notice Mel required to prepare a fair defense, was a clear violation of the 1st Amendment.

## When   States   May   Truncate   Federal   Rights

86.   In limited cases, states are permitted to interfere with some fundamental federal rights if there is a compelling state interest, and it is "narrowly-tailored".   The state court has admitted this:

> Section 909 of the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. § 2869, requires that a circulation be

> a qualified elector duly registered and enrolled as a member of the
> political district referred to in the petition. However, in Morrill v. Weaver,
> 224 F.Supp.2d 882 (E.D.Pa.2002), the U.S. District Court held that this
> residency requirement is unconstitutional. The court stated that the
> requirement severely burdens protected First Amendment rights of free
> political expression and association, and the requirement is not narrowly
> tailored to serve a compelling state interest.

Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth. 2003). See

also, Rogers v. Corbett, 468 F.3d 188, 191 n. 5 (3d Cir. 2006)(the court must take a careful look if

the First Amendment is at stake);  Lawrence v. Texas, 539 U.S. 558, 593, 123 S.Ct. 2472, 156

L.Ed.2d 508 (2003)("substantive due process "prohibits States from infringing fundamental liberty

interests, unless the infringement is narrowly tailored to serve a compelling state interest").

87.   These exceptions can be summarized by two clear scenarios.

88.   **In the first**, they can be cut short where reasonable post-hoc remedies are available.

DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 597 [2](3d Cir. 1995)(state provides

constitutionally adequate procedural due process when it provides reasonable remedies to rectify

legal error by a local administrative body).

89.   Here, however, because the legislature set the nomination collection phase and the trial

phase deliberately close to the Primary Election date and gave state courts jurisdiction over election

challenges only in a small pre-primary 15 day window for trials, no post-hoc process is available at

all because the state courts lose their jurisdiction.   And appeal windows are also shortened to days

and the appeals court has no duty to start to apply the missing fundamental federal rights from the

state courts but has discretion to continue to ignore them.   So the highest state court also ignores the

federal due process rights that the U.S. Supreme Court has held state courts have no power to ignore.

90.   Therefore, candidates who are denied the right to defend themselves fairly like Marin in

2014 are removed from the ballot and can only petition for write-in status, but the Supreme Court

has already ruled the write-in alternative is not meaningful in Anderson v. Celebrezze, 460 U.S. 780,

806, 103   S.Ct. 1564, 1578, 75 L.Ed.2d 547, 799 n. 26 (1982)(a write-in chance for missing a

nomination deadline with a major party "is not an adequate substitute for having the candidate's

name   appear on the printed ballot" . . . so the interests of voters to express their support for the

candidate outweighs any state interest in maintaining its candidate filing deadlines because the state "has a less drastic way of satisfying its legitimate interests" . . . and "may not choose a legislative scheme that stifles the exercise of fundamental personal liberties').

91.   **In the second** exception, due process can be cut short if exigent circumstances exist to avoid a   crime or   loss of   life.   Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc., 452 U.S. 264, 300, 101 S.Ct. 2352, 2373, 69 L.Ed.2d 1   (1981)("summary administrative action may be justified in emergency situations", like avoiding a mining disaster, where the statutory rules allowing action without pre-deprivation of due process "are specific enough to control governmental action and reduce the risk of erroneous deprivation").

92.   Here, however, there is no crime afoot in every election every year. No life is threatened.   There is only a time-deadline that the state legislature waits to impose until the last moment, in order to give the impression year after year and decade after decade that there is some rush.

93.   They could easily have allowed the nomination petitions of 1,000 signatures to be collected during a 90 day period in the summer and fall when there is no snow before the election year and move up challenges to the fall and give them 90 day windows so that some discovery can be allowed and not 14 day windows, and they can move the Primary Election date to March rather than 21 days in the spring just before a May primary, like other states do, so   *pauperis* candidates have a chance.

94.   In other words, the constitutional failures above do not result from a genuine time exigency like the "hot pursuit" of catching a running suspect after a crime.   Instead, they result but from a fake exigency engineered by the state legislature when they know there is no genuine emergency, but they   fabricate one by creating deadlines that eliminate the time needed for due process, as in Holman v.   City of Warrenton, 4 F.Supp.2d 791, 807 (D. Ore. 2002)(the rationale for taking property by denying a building permit and denying the due process of a pre-taking hearing simply does not apply if the public officials know no emergency exists).

95.   The state may then argue that it *costs*   too much money to open the nomination challenge process   wide enough to allow for *real* trials with the annoying due process standards that

take more than 2 weeks, but the Supreme Court has already ruled that is not a compelling state

reason to deny   the normal full trial with all the bells-and-whistles:

> Nor is additional expense occasioned by the expanded hearing sufficient
> to withstand the constitutional requirement.   While the problem of additional
> expense must be kept in mind, it does not justify denying a hearing meeting
> the ordinary standards of due process.

Bell v. Burson, 402 U.S. 535, 541, 91 S.Ct. 1586, 1590, 29 L.Ed.2d 90 (1971).

96.   Additionally, while requiring nominating voters to sign may meet a compelling state

interest of   identifying them and is narrowly-tailored, requiring that they also *print* in little boxes

before their vote will count which eliminates the right to vote of 51,000 aged and ill voters in an

electorate of 300,000, is excessive and not tailored.    It also severely changes the electoral results,

since every contested congressional election in this district in its history has been decided by fewer

than 51,000 votes.   Had those 51,000 infirm voters been allowed to vote, there would be a different

congressman in Erie today.


**Refusal  To  Allow  Or  Consider  Mel's  Evidence**

97.   Additionally, because Mel offered evidence that at least 200 of his nominators were

disabled and unable to print their information in the little boxes which would have qualified him and

the state court refused to count those 200, the state ruling must be disregarded.

98.   First, Marin subpoenaed state Medical records that would have showed the 200

additional voters were genuinely disabled even though they lived at home, the state judge's refusal to

allow that discovery made the entire proceeding unreliable for comity purposes, under Morgan v.

United States, 304 U.S. 1, 58 S.Ct. 999, 1000 [2], 82 L.Ed. 1129 (1938) (failure to allow litigant

discovery compels reversal).

99.   Second, the only other evidence the judge had was Marin's testimony on April 10 that

he met all of the nominators himself and that he printed the names in boxes for those who needed

assistance   because it was too hard for them or they were sick, or feeble, or could   not see because

of excuses like cataracts and they asked for that help, following exactly the process set out in

Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth.   2003).

100.   Marin's testimony was evidence, under the rule in <u>United States v. Drummond</u>, N. 1:09-cr-159, 2010 U.S. Dist. LEXIS 29981, at * 9 (M.D. Pa. Mar. 29, 2010) (testimony constitutes evidence), <u>Castle Cheese, Inc. v. MS Produce, Inc.</u>, No. 04-878, 2008 U.S. Dist. LEXIS 71053, at * 105 (W.D. Pa. Sept. 19, 2008)(testimony constitutes evidence), <u>Flowers v. Southern Regional Physician Services</u>, 247 F.3d 229, 238 (5th Cir. 2001)(testimony constitutes evidence), and <u>Spees v. James Marine, Inc.</u>, 617 F.3d 380, 397 (6th Cir. 2010)(testimony constitutes evidence).

101.   In a normal appeal, that decision of the lower judge to rule opposite to the only evidence given, would be considered arbitrary and not entitled to any consideration anywhere, according to   <u>O'Keefe's Inc. v. U.S. Consumer Product Saftey Com'n.</u>, <u>supra</u>, 92 F.3d 940 (9th Cir. 1996)(an agency decision is arbitrary and capricious if the agency . . . offers explanation that runs counter to evidence before the agency).

102.   It should be the same here, to allow this court to disregard rules of comity and *res judicata.*

103.   Moreover, attorneys for the state agencies that Marin subpoenaed also confided that no candidate is *ever*   allowed to call them as witnesses nor to reach their health and signature records to prove all the nominators are good or disabled because the legislature allows only 3 weeks for the entire trial process from filing the complaint to trial, and it takes each state office at least a month to find those records.    So, if the state judge here had not denied Marin the right to present evidence to punish Marin for filing this federal removal, he still would have denied all government witnesses because denying candidates witnesses is the process in all nomination cases.

**The   Pennsylvania   Nomination   Statutes   Are   Void   "On-Their-Faces"**

104.   For these reasons these state statutes are void   "on- their-faces" under the standard of <u>United States v. Salerno</u>, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 )(1987)("no set of circumstances exists under which the Act would be valid").

105.   The residency service-of- process rule and order of the state judge is unenforceable and improper and/or void, because the federal constitution does not require either a   residence nor the duty to report a residence, as a dozen courts have already ruled.

106.   The signature and printing statute also fails "on-its-face" because a signature alone is enough to verify that the nominator is the person at the same address because his signature on state voting, driving, welfare and medical   records is enough to match that signature.   Printing is *always* an "extra" burden, and is also an unreliable indicator anyway, because family members routinely print government and medical forms for their disabled family members.     Because it is an unreliable and unnecessary extra burden it is not narrowly-tailored.   Kusper v. Pontikes, 414 U.S. 51, 58-59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973)("even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty"); Williams v. Rhodes, 383 U.S. 23, 31-33, 89 S.Ct. 5, 10-11, 21 L. Ed. 2d 24 (1968)(states must adopt "the least drastic means to achieve their ends", not the "most" drastic means).

107.   Moreover, even if "rational basis" were the proper test, the printing rule fails that too, because printing does not actually prove identity of the nominator, and no handwriting expert has ever   verified the identity of a printer for a nomination case on printing alone.   It only proves that someone printed.

108.   Additionally, the printing statute also does not set-out any standards to be applied, making it void for vagueness, under Smith v. Goguen, 415 U.S. 566, 574 (1974) (" the most meaningful aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement.").

109.   And nowhere does the statute provide for how many disabled pass muster, nor what the criteria must be.   Marin is a trained Emergency Medical Technician.   He made the decision that persons who quit after signing their names and printing their   names because they were exhausted from just standing up and singing, "needed assistance" and they asked for help.     But the statute (with the Fitzpatrick effectively becoming part of the statute), does not say what the criteria is. Therefore, the statute is always void on its face:

> [T]he statute in question is vague as applied to the litigant's conduct without regard to its potentially vague application to others . . .
> a perfectly vague statute is one which provides no ascertainable standard for inclusion and exclusion .. . .
> The "annoying" criterion is not vague merely in the sense that

it is "an imprecise but incomprehensible normative standard";
instead, it specifies no standard at all because one may *never* know
in advance "what annoys some people".

In re Complaint Against Harper, 77 Ohio St.3d 211, 221, 1996-Ohio-2344, 673 N.E.2d 1253 (1996).
See also, Papachristou v. City of Jacksonville, 163, 92 S.Ct. 839, 843 [2], 31 L.Ed.2d 110
(1972)(The ordinance is void for vagueness if it "fails to give a person of ordinary intelligence fair
notice that his contemplated conduct is forbidden by the statute."); *Connally v. General Construction
Co.,* 269 U. S. 385, 391 46 S. Ct. 126, 70 L. Ed. 322 (1926) ("[A] statute which either forbids or
requires the doing of an act in terms so vague that men of common intelligence must necessarily
guess at its meaning and differ as to its application, violates the first essential of due process of
law").


**The   Pennsylvania   Nomination   Statutes   Are   Void   "As-Applied"**

110.   These state nomination statutes are void "as-applied" as well.   This is because the
state's rule includes the manner of its enforcement:

> He had a personal savings account of $1,500 . . ..
> The statutory scheme at issue tended to "deny some voters the opportunity to
> vote for the their choosing, while simultaneously giving affluent voters . . .
> the power to place on the ballot. . . the names of persons they favor.
> [W]e conclude that the difficulty in raising the funds to pay
> the required fee, looked at in the light of the total assets of the candidate
> . . . and to expend funds needed to pay ongoing living expenses and prior
> legitimate debts is sufficient to demonstrate financial hardship.
> . . .   The challenged fee structure fell with unequal weight on voters as well as
> candidates, according to their economic status.

Belitskus v. Pizzingrill, 343 F.3d 632, 642, 644,   646 (3d Cir. 2003).   See also, Larsen v. Senate
of   Com. Of Pa., 154 F.3d 82, 90 (3rd Cir. 1998)(state retirement rule amendments that affect
employees whose rights were vested prior to enactment may be valid to new employees but are
"void as applied" to prior employees),   Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32
L.Ed.2d 15 (1972) (state's mandatory attendance law good on its face but void as applied to Amish
children who have graduated from 8th grade), Drumheller v. Department of the Army, 49 F.3d 1566,

1570-73 (Fed. Cir. 1995)(federal courts may review the constitutionality of the actual process used).

111.   Because the way in which the statutes are enforced here, no poor candidates have a fair chance at the right of discovery, and none are ever allowed to subpoena state witnesses and records, and none of those state officers will make themselves available because they know the state court will not order it, and poor candidates will never have a fair chance to collect the required number of healthy signatures because the legislature every year sabotages the pauper candidates and denies the time required for due process, even if the statutes were valid on their faces they are still void as applied, al the time.

112.   Ten *pauper* democratic candidates started the race in February 2014, and only Marin collected the required number but he had to do so with the disabled who do not count.     That is a failure rate of 100% of *pauper* candidates because the state legislature cripples them in advance on purpose.

113.   WHEREFORE, Marin seeks and is entitled to a declaratory judgment that the statutes at issue are void on-their-faces and void as-applied, and (a)   enjoining the state officials from requiring the printing of all nominators as well as their signatures, and (b) enjoining the SECRETARY from   setting and publishing a petition nomination phase for the collection of 1,000 nominators from being less than 90 days, and enjoining a challenge and trial phase of less than 90 days to stop the punishment of pauper candidates, and (c) enjoining the state defendants from requiring a new round of signatures for Marin for the congressional race in 2016 and from refusing to certify him at once as a candidate, and (d) enjoining the state defendants from refusing to provide at no cost walking paper voter lists at once rather than wait until any date in 2016 or the filing of formal nomination papers in Harrisburg.

THIRD   CLAIM   FOR

VIOLATION   OF   THE   CIVIL   RIGHTS   ACT

AGAINST   THE   SECRETARY   OF   THE   COMMONWEALTH

AND   THE   COMMISSIONERS

OF   BUTLER   COUNTY   PENNSYLVANIA

WILLIAM   L. MCCARRIER,   A. DALE   PINKERTON,

JAMES   ECKSTEIN,   SHARI   A.   BREWER

IN   THEIR   OFFICIAL   AND   PERSONAL   CAPACITIES

FOR   DENIAL   OF   VOTING   LISTS

114.   Marin hereby incorporates all prior allegations into this one.

115.   In 2013 and 2015, Marin sought lists of voters for Butler, Erie, and Mercer Counties, at no charge so that he could compete early and meaningfully for a public office and was refused until the SECRETARY certifies him to be a candidate on about March 10 in the election year; and BUTLER   COMMISSIONERS refused forever because they do not recognize the existence of and provide no alternate rules for costs, filing or other county services for the indigent than for the wealthy.

116.   Because the Erie, and Mercer County lists were allowed at no cost too close to the Election Primary to be meaningful since it takes months and not days to walk one county, and because the   BUTLER COMMISSIONERS refused entirely, Mel was not able to campaign meaningfully in 2010, 2012 and 2014 and 2015 in any of these three counties that include 90% of the voters of the congressional   district.

117.   On May 18, 2015, the BUTLER Election Office director confirmed to plaintiff by conversation that she will not give him that list unless he pays the charge of $150 and the defendants do not allow any exceptions to that charge even for the indigent candidate who cannot pay it. However, since plaintiff could not pay the $100 congressional filing fee, he certainly could not pay more for the voter list.

118.   She also offered that he can get a CD with the same names that costs less, but since the

cost to print each page at any library is 25 cents a page, the cost of $250 is the same.   But she refused a no-cost list at any time.

119.   Marin then sent a demand letter for the same and this complaint showing violation of Mel's due process rights to the BUTLER COMMISSIONERS WILLIAM   L. MCCARRIER,   A. DALE   PINKERTON,   JAMES   ECKSTEIN,   SHARI   A.   BREWER on the same day, showing in the letter that their refusal may amount to a denial of constitutional rights and a damages claim when they should have known better; and they refused.

120.   Marin then sent a letter on June 12, 2015 making the same demand to defendant CORTES, the SECRETARY OF THE BUREAU OF ELECTIONS, demanding that he direct these county election offices to make these lists available at no-cost immediately, because of plaintiff's poverty, and he ignored it.

121.   The federal court of appeals has ruled that a rule imposing a $100 filing fee on a candidate even if he is not indigent, but simply because he cannot pay it and also conduct a meaningful campaign, is excessive because it falls with   unequal weight on those who cannot pay it:

> He had a personal savings account of $1,500 . . ..
> Even though the Commonwealth has a compelling interest
> in limiting the field of candidates, "we conclude that the
> difficulty in raising the funds to pay the required fee, looked
> at in the light of the total assets of the candidate . . . and to
> expend funds needed to pay ongoing living expenses and prior
> legitimate debts is sufficient to demonstrate financial hardship.
> . . .   The challenged fee structure fell with unequal weight on
> voters as well as candidates, according to their economic status.

Belitskus v. Pizzingrill, 343 F.3d 632, 642, 644,   646 (3d Cir. 2003).

122.   The test of due process is not whether a citizen can secure the government benefit at the same price as every one else; but whether that "one-size-fits-all" charge makes the government benefit (the voter list) meaningless under his circumstances, according to federal courts in Beck v. City of Pittsburgh, 89 F. 3d 966, 972-73 (3rd Cir. 1996)(investigation must be meaningful so as not to violate due process), and Folkers v. City of Waterloo, Iowa,   582 F.Supp.2d 1141, 1153 [13] (N.D. Iowa 2008)("There is no "one size fits all" formula for what process is due in all

circumstances. . . The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner.").

123.   However, access in a meaningful time and manner to voter lists that are only under the control of the government, affects the effort to run for office in the same way, by denying the run through the sabotage of providing it at a cost that is far in excess of what an indigent candidate can pay and at a time when it is too late to use it because those restrictions constitute severe burdens on a meaningful race, as warned by <u>Mandel v. Bradley</u>, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (severe burden on Independent candidates), Tucker v. Salera, 399 F. Supp. 1258 (ED Pa. 1975), <u>affirmed</u>, 424 U. S. 959 (1976), and <u>Folkers v. City of Waterloo, Iowa</u>, 582 F.Supp.2d 1141, 1153 [13] (N.D. Iowa 2008)("There is no ⁻one size fits all. formula for what process is due in all circumstances. . . The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.).

124.   Therefore, the refusal of these COMMISSIONERS to waive that charge as plaintiff requested orally and in writing is or would be an actual or proximate cause of his failure exercise his 1ˢᵗ Amendment right to campaign meaningfully.

125.   And the refusal of the COMMISSIONERS to waive that cost because of plaintiff's inability to pay it, violates both the Equal Protection and Due Process clauses of the 14ᵗʰ Amendment of the   Constitution of the United States, as in <u>Belitskus v. Pizzingrill</u>, 343 F.3d 632, 642, 644,   646 (3d Cir. 2003) in which the court ruled in favor of another candidate on these same issues, and <u>Marin v. Commissioners of Armstrong County</u>, 2015–312-civil (Common Pleas 2015) in which a local court ruled in favor of *this* plaintiff on his right to waive election fees under the precedent of in <u>Belitskus v. Pizzingrill</u>.

126.   And the COMMISSIONERS' refusal to act in any way at all to remedy the refusals, knowing those refusals violated the constitution and could sabotage any fair attempt to run for office, would normally and does here, "shock the conscience" of any reasonable person omitted to the constitution of this land.

127.   And the ELECTION SECRETARY'S refusal to take action to stop the violations from Harrisburg knowing of the continuing violations when all he had to do was make short calls to the

counties and direct their election offices to provide the help immediately at no cost, also shocks the conscience.

128.   To state a § 1983 claim, a plaintiff must plead two essential elements: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the petitioner of a right, privilege, or immunity secured by the Constitution or laws of the United States.   Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 580–81 (3d Cir.2003).

129.   The BUTLER COMMISSIONERS' refusals to act as described above are conduct by persons acting under color of state law because county officials are considered to be state officers for this claim.

130.   The conduct deprived Mel of rights secured by the 1st and 14th   Amendments to the Constitution of the United States as described above

131.   The BUTLER COMMISSIONERS are personally liable for the refusals of the county elections office because that office violated Mel's constitutional rights under the Due   Process and Equal Protection clauses, and the BUTLER COMMISSIONERS were and are the supervisors of the county election office and had the power to remedy the violation and failed to do so when given notice of it, and instead, acquiesced-in the unconstitutional conduct of the election office, under the rule in Starr v. Baca, 652 F.3d 1202, 1207 [3](9th Cir. 2011)(a supervisor is deliberately indifferent when he has knowledge of the wrongs and acquiesces in it), and Kaucher v. County of Bucks, 455 F. 3d 418, 422 (3rd Cir. 2006)(a claim of deliberate indifference that could shock the conscience of anyone is a good claim), and   Hydrick v. Hunter, 449   F.3d 978, 990 [11](9th Cir.   2006) (11th Amendment does not bar damages action against state officers in their personal capacity based on a showing of deliberate indifference), and Oden   v.   Northern Marianas College, 440 F.3d 1085, 1089 (9th Cir. 2006)(government college may be liable for deliberate   indifference to civil rights wrongs if a jury "could find that the College made 'an official decision ... not to remedy the violation'").

132.   The ELECTIONS   SECRETARY is personally liable for Mel's losses because by the BUTLER election office denying Mel's requests it violated Mel's constitutional rights under the Due Process and Equal   Protection clauses, and the SECRETARY was and is the supervisor of all state

county election offices and had the power to remedy the violation and failed to do so when given notice of it, and instead, acquiesced-in the unconstitutional conduct of the election office, under the rule in <u>Starr v. Baca</u>, 652 F.3d 1202, 1207 [3](9th Cir. 2011)(a supervisor is deliberately indifferent when he has knowledge of the wrongs and acquiesces in it), and   <u>Kaucher v. County of Bucks</u>, 455 F. 3d 418, 422 (3rd Cir.   2006)(a claim of deliberate indifference that could shock the conscience of anyone is a good claim).

133.   There is no immunity for any county officials to prospective injunctive relief even if they would have immunity normally because of their position, according to <u>San Francisco County Democratic Cent. Committee v. Eu</u>, 826 F.2d 814, 825 [11] (9th Cir. 1987),   <u>affirmed</u>, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989)("Eleventh amendment does not bar actions seeking prospective declaratory relief from enforcement of unconstitutional statutes.") and <u>Burns v. Alexander</u>, 776 F.Supp.2d 57, 73 (W.D. Pa. 2011)(official capacity suit against state secretary is not a suit against the state and is permissible for prospective injunctive relief).

134.   Additionally, no immunity is available for the BUTLER COMMISSIONERS to damages, because they knew or should have known that their refusal to waive fees for the walking lists for the indigent, and their policy of allowing only the wealthy to run for Congress, violates federal law because the ruling in <u>Belitskus v. Pizzingrill</u> made that clear over a decade ago, under the rule in   <u>Johnson   v. Delaware County</u>, 27 Del.Co. 567, 34 Pa. D. & C. 23 (1939)(candidate may sue for damages after his request to waive the candidate filing fee is denied, because the fee structure in the Pennsylvania statutes is arbitrary to being with) and <u>Walker v. Brooks</u>, 2009 U.S. Dist. LEXIS 91566 at *24 (W.D. Pa. Sept. 30, 2009)(the fact that the High Court ruled on the issue in a different fact scenario prevents immunity), and <u>Williams v. Bitner</u>, 455 F.3d 186, 190 [8](3d Cir. 2006)(although neither the Supreme Court nor Court of Appeals has ruled on the issue, immunity is still denied when "other courts that. had considered the precise question had uniformly held" against the punishment).

135.   Moreover, Marin actually cited some of these cases to the BUTLER COMMISSIONERS in his letter of May 18, 2015 so they had express notice that ignoring Mel's request could subject them to personal liability and they still ignored Mel.

136.   Moreover, this complaint was also sent to the BUTLER COMMISSIONERS after filing in this court, to give them a 3rd chance to provide the paper walking list at once for free, and they still refused.

137.   Mel also provided this complaint after filing in the federal court, to the state SECRETARY, and he failed to direct the county offices to provide paper walking lists at no cost at once.   Therefore, he knew that his refusals to remedy were violative of the constitution and continued to refuse,

138.   This list of refusals, therefore, shows knowledge by the county officials and the state SECRETARY that Mel's constitutional rights were being violated, knowledge of the actual case law on which Mel was relying, and it shows a continuing "deliberate indifference" of the defendants to that harm inflicted on Mel to the degree that would shock the conscience, thereby violating Mel's 1st and 14th Amendment fundamental federal constitutional rights, and giving Mel a valid claim for damages against each of the defendants in their personal capacities for that deliberate indifference, under the rule in Hydrick v. Hunter, 449   F.3d 978, 990 [11](9th Cir.   2006) (11th Amendment does not bar damages action against state officers in their personal capacity based on a showing of deliberate indifference), and Oden   v.   Northern Marianas College, supra, 440 F.3d 1085, 1089 (9th Cir. 2006)(college may be liable for deliberate indifference to civil rights wrongs if a jury "could find that the College made 'an official decision ... not to remedy the violation'").

139.   The harm visited upon Mel by the refusals of these defendants to provide those lists at no cost at once will be the loss of the congressional race in 2016 since Mel's only chance to meaningfully run is now, and starting on March 10, 2016 is too late.   That results in the loss of the salary of the entire congressional career of $175,000 a year or $3.9 million for the entire career, for which the defendants are personally liable under the rule in   Bowers v. NCAA, 475 F.3d 524 (3d Cir. 2007)(student athlete may state claim for loss of entire career by denial of athletic participation even though he never took   classes because he was wrongfully stopped early) and Gold v. Los Angeles Democratic League, 49 Cal.App. 3d 372, 375 [13], 122 Cal.Rptr. 732, 739 (1975)(good claim for interference with chance of running for city controller even though he had no track record in that office, and no existing contracts and merely took steps to run and was then stopped).

140.   Even if the denial of this list is not the only reason for a congressional loss, a jury may still make an award for the loss of the entire career if the jury finds this denial was one cause of the harm according to <u>Scirex Corp. v. Federal Ins. Co.</u>, 313 F.3d 841,   849-50 (3d Cir. 2002)(the direct cause of a loss "does not have to be the sole cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be a proximate or substantial cause" of the loss to allow a damages award).

141.   And even if Mel does not lose the entire value of the congressional career, he is still entitled to a jury award of any amount that the jury may decide to compensate for the loss of the loss of constitutional rights, under the rule in <u>Baker v. National State Bank,</u> 353 N.J. Super. 145, 165, 801 A.2d 1158, 1170 (2002)($1.8 million verdict for violation of due process rights upheld regardless of   the actual loss to plaintiff).

142.   WHEREFORE, because the conduct of the defendants violates the constitution and harms plaintiff now, he seeks directly under the Constitution and through the Civil Rights Act, a declaratory judgment finding that the refusal to supply the same list to him and all candidates who cannot pay it is unconstitutional as applied to those who cannot pay, and an injunction barring the defendants in their official capacities from   continuing to refuse to supply him with the walking list he requests at once, by order of precincts and streets.

143.   ADDITIONALLY, Mel seeks and is entitled to an award of damages of $3.9 million against each defendant in his personal capacity based on violations of the 1st and 14th Amendments and the Civil Rights Act (42 U.S.C. § 1983), for the loss of the congressional career.

### FOURTH   CLAIM   FOR

### DAMAGES   FOR   INTERFERENCE   WITH   CAREER   AGAINST CHARLES   RICE   AND   CHARLES   ANTHONY   PASCAL

144.   Marin hereby incorporates all prior allegations into this one.

145.   Marin took substantial steps in 2014 to start a congressional career.

146.   These defendants without lawful basis under existing precedent commenced the state law suit to interfere with or stop that career.

147.   They did so not on the merits of whether Marin was qualified or not, but with the intent of   prevailing by tricks, to wit: using state laws that were unconstitutional to distract Marin, abusing court processes, misrepresenting the basis of their challenge in their initial filing and in their public statements to the media in order to prevent Marin from preparing a fair defense, and "hiding the ball" so Marin would have to travel across the state to Harrisburg examine the complaint and to find   witnesses which travel prevented Marin from also being in Western Pennsylvania to meet with PASCAL as ordered by the state judge, and to cause Marin to lose the Primary Election even if he prevailed in the litigation because he would have to devote all of his time to legal research and court drafting.

148.   These defendants were not justified in these actions against Marin.

149.   These actions were unlawful and / or abusive and crippled Marin's run for Congress.

150.   Because Marin's congressional career was unjustifiably stopped by these defendants, a jury is entitled to assume plaintiff would have won the Democratic Primary in 2014 and would have continued with a 20 year congressional career, and that these defendants' interference with those efforts of Marin were the proximate or substantial cause of the loss of that congressional race, according to   Small v. United States, 333 F.2d 702, 704 [5](United States Court of Appeals For The 3d Circuit 1964) (interference with pursuit of a lawful business or occupation is analogous to interference with contract "and is governed by the same principles."), and Della Penna v. Toyota Motor Sales, U.S.A., 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 447 [3](California Supreme Court 1995).

151.   Marin is, therefore, entitled to "expectation" damages, or what he expected in the career he would have had, according to Colvig v. RKO General, Inc. , 232 Cal.App.2d 56, 42 California Rptr. 473 (1965)(a sufficient allegation of damages is made for a jury by claiming a loss of $250,000 for being stopped from a career as a radio announcer), and Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 669 [9](U.S. Court of Appeals For The 3d Circuit 1998)(under expectation damages a plaintiff may be entitled to what he expected under contract).

152.   Marin expended $600 in actual costs for travel and preparation for the state trial which was removed to the federal court here on April 7, 2014, and lost the use of $1,200 worth of actual costs for campaigning before the defendants filed their abusive state court challenge and these

constitute actual monetary "out-of-pocket" losses Marin incurred and will not "get-back" because of the actions of these defendants.    Marin also expended over 360 hours of time for researching, running around, drafting and appearances in their unlawful state action and in this federal action to try to get back onto the ballot, and was thereby unable to campaign, or to work for the family trust at the rate allowed in that trust of $300 an hour for that entire time, thereby losing $108,000 of billable hours on a defense to their unlawful and abusive actions.

153.   These actions by these defendants were abusive, deliberate and heavy-handed, and intended to hurt Marin by depriving him of his right to run for Congress.

154.   The manipulative and deliberate and heavy-handed conduct of these defendants was the actual or "substantial" or proximate cause of these losses to Marin.

155.   Additionally, because Marin as of 2014 expected to make $165,000 a year at Congress for two years,   and these defendants unjustifiably stopped plaintiff, plaintiff is also entitled to "expectation" damages of $350,000   for two lost years in Congress.

156.   Because Marin reasonably expected to be re-elected for 20 years, he is also entitled to "expectation" damages of $3.9 million for a lost career in Congress after the present two years.

157.   It is not necessary for Marin to receive a jury award that he allege and a jury agree that the acts of these defendants were the *only* cause for Marin's loss of the congressional job or career. There could have been other reasons for the loss of that campaign and career, including illness, poverty, unrealistic political platform, or lack of time.   Instead, it is only necessary that Marin allege and this jury agree that the conduct of these defendants was at least *one* cause for the loss of the congressional race or career, and the jury can still make an award it feels is a fair measure of the contribution of the defendants as to actual losses of wages Marin could have earned in the career, according to <u>Scirex Corp. v. Federal Ins. Co.</u>, 313 F.3d 841,   849-50 (3d Cir. 2002)(the direct cause of a loss "does not have to be the sole cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be a proximate or substantial cause" of the loss to allow a damages award).

158.   And it is for a jury and not a judge to determine if this or any other amount is a fair expectation demand under the rule in   <u>McGrath v. Zenith Radio Corporation</u>, 651 F.2d 458, 471 n. 8 [18] (7th   Cir. 1981) (court cannot eliminate damages for interference with career as speculative

because whether it is speculative is a jury issue and a jury instruction is available for it), Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 412 [7](3d United States Circuit Court of Appeals 1999)(plaintiff's complaint is good if he alleges he was denied opportunity to work in the field he chose, and is not required to take work of a different kind other than his chosen field),   Gold v. Los Angeles Democratic League, 49 Cal.App.3d 372, 375 [13], 122 Cal.Rptr. 732, 739 (1975)(good claim for interference with chance of running for city controller even though he had no track record in that office, and no existing contracts and merely took steps to run and was then stopped),   Vogue v. National Rolling Mills, 72 D. & C. 2d 332   (Chester Co. Pa. 1974)(defendant knew plaintiff had left work in another state to come here and the jury may consider the bonus and the annual salary talked about to make an award of damages ),   Warren v. Greenfield, 595 A.2d 1308, 1314 (Pa. Super. 1991)(the fact that   plaintiff's business was "new and untried" does not prevent the plaintiff's losses from being foreseeable), Bowers v. NCAA, 475 F.3d 524 (3d Cir. 2007)(student athlete may state claim for loss of entire career by denial of athletic participation even though he never took   classes because he was wrongfully stopped early), and In re Brown, 481 B.R. 351, 363 (W.D. Pa. 2012)(actual damages may include lost wages).

159.   Moreover, even if the jury finds that the conduct of these Defendants warrants only a nominal or minimal award of "out-of-pocket" costs based on Marin's travel costs and time costs without a loss of congressional wages attributable to their actions, the jury may still award punitive damages in an amount far in excess of the actual "out-of-pocket" losses, where it finds the Defendants actions were deliberate or abusive, or heavy-handed, and were intended to injure Marin personally and   professionally, as in Central Telecommunications v. TCI Cablevision, 800 F.2d 711, 731 [10](8th Cir. 1986) (award of $25 million in punitive damages on claim for interference with business expectancy was supported by showing that defendant used heavy handed tactics to prevent plaintiff from starting its business in a city and because the plaintiff took   substantial steps to enter that business), and Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 555 A.2d 800, 803-04 (1989) (punitive damages need not bear a reasonable relationship to compensatory damages under tort law).

160.   WHEREFORE, Marin seeks and is entitled to an award of $1,800 in "out-of-pocket" costs for time and money spent before the state action which can never be recovered, $108,000 for

time and money spent to try to stop their attacks, for $ 3.9 million in lost congressional career wages, and for $3 million for punitive damages against each defendant named in this particular claim.

## FIFTH   CLAIM   FOR   DAMAGES
## FOR   VIOLATION   OF   THE   CIVIL RIGHTS   ACT
## AGAINST   CHARLES   RICE   AND   ATTORNEY   CHARLES   ANTHONY   PASCAL

161.   Marin hereby incorporates all prior allegations into this one.

162.   The right to run for public office is a right protected by the 1st Amendment right of association:

> [E]very citizen shall have the right to engage in political
> expression and association which right was enshrined in the
> 1st Amendment of the Bill of Rights. . ..   Associational rights
> include activities pursued in the cause of a campaign for public office.

Barker v. State of Wisconsin Ethics Bd., 841 F.Supp. 255, 258 (W.D. Wis. 1993).

163.   Denial of a 1st Amendment right is a proper basis for a §1983 action.   Robb v. Philadelphia, 733 F.2d 286, 290-91   (3rd Cir. 1984)(for 1983 a claimant must show that the conduct deprived him of rights, including 1st Amendment rights, secured by the Constitution or laws of the United States and was committed by a person acting under color of state law).

164.   The defendants named in this claim deprived Marin's of his 1st Amendment right to run for office which is secured by the Constitution of the United States, by:   (a) using as their basis for the challenge state laws that had already been declared void by both state and federal courts, (b) playing a litigation game called "hide-the-ball" with the same unlawful state rules as described above so Marin   would not get served in time to act fairly to create a defense or to know the correct bases of their charges, (c)   requiring a state judge to act outside his authority by issuing an unlawful and corrupt order to stop Marin's exercise of the 1st Amendment right by removing Marin from the ballot after the state court action was extinguished by removal to federal court, (d) causing to be published false information in a public newspaper to mislead Marin and unjustifiably accuse Marin of fraud in the public.

165.   In doing this, they acted under color of state law, by enlisting the aide of a state judge and the SECRETARY OF THE COMMONWEALTH by manipulation, deceit, and unlawful demands.

166.   The ELECTIONS BUREAU SECRETARY acted outside his jurisdiction by executing an order to remove Marin on April 14, 2014 from the Democratic Primary ballot for May 20, 2014 after the SECRETARY knew Marin had removed the state action to the federal court on April 7 and extinguished the authority of the state judge to issue that order, according to Security Farms v. International Broth. of Teamsters, 124 F.3d 999 (9th Cir. 1997)(a state proceeding is extinguished by the removal).

167.   Specifically, at about 10:12am on April 10, 2014 in state court on the 17th Floor at 637 Grant St. (the Frick Building), Pittsburgh, after Marin reminded the judge that the action was removed and that the court had no jurisdiction to continue and filed a motion to dismiss for that purpose, the state judge acknowledged that he knew Marin had removed the state action to federal court on April 7.

168.   The SECRETARY also knew because attorneys for the SECRETARY filed motions to quash Marin's subpoenas with that judge but without giving notice to Marin, and were informed of the removal to federal court and also ignored it.

169.   Because these private defendants used the state judge and SECRETARY in a corrupt way with an express request to execute their attack and achieve their goal of removing Marin by enlisting the state SECRETARY to join their cabal and take Mel off the ballots in 7 counties, their actions were "under color of state law" even though they are private persons, under the rule in Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) ("private persons jointly engaged with state officials in the challenged action , are acting under color of state law for purposes of § 1983 actions"), Coulter v. Ramsden, 510 F.App'x 100, 103 [1](3rd Cir. 2013)(private persons can be acting under color of state law when a judge acts corruptly to assist them in depriving a party of civil rights), Dykes v. Hosemann, 743 F.2d 1488, 1494 (11th Cir. 1984) (private party can be guilty of violating the Civil Rights Act by using judge for the wrongful acts thereby establishing color of state law even if the judge is immune), Dahlberg v. Becker, 748 F.2d 85, 92 (2nd Cir.

1984)(where private persons invoke the authority of state law, such as calling on police to execute their demands, and the state officers knew at the time that they were acting outside their authority, this meets the "abuse of authority" rule in Lugar);   Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 942, 102 S.Ct. 2744, 2756 [10] , 73 L.Ed.2d 482 (1982) (a § 1983 claim is properly made when the petitioner alleges private actors used state officers to enforce the demands of the private persons to deprive the petitioner of property where the state statute relied upon was challenged as unconstitutional); Darr v. Wolfe, 767 F.2d 79, 80 (3rd Cir. 1985)(it does not matter if the judge is immune from damages liability for conspiring with private persons to unlawfully deny rights and does not affect the liability of private parties for damages under §1983).

170.   They executed this scheme against Marin to punish or retaliate against Marin for his moderate political views,   which views are protected from punishment by government officials or private persons using state officers according to   Dilegge v. Gleason, 131 F.Supp.2d 520, 522 [5](S.D.N.Y. 2001)(city's retaliation for exercise of free speech may form basis of § 1983 action).

171.   These actions by these Defendants were abusive, deliberate and heavy-handed, and intended to hurt Marin by depriving him of his right to run for Congress; and did so hurt Marin.

172.   The manipulative and deliberate and heavy-handed conduct of these defendants was the actual or "substantial" or proximate cause of these losses to Marin.

173.   Marin also expended over 360 hours of time for researching, running around, drafting and appearances in their unlawful state action and in this federal action to try to get back onto the ballot, and was thereby unable to campaign, or to work for the family trust at the rate allowed in that trust of $300 an hour for that entire time, thereby losing $108,000 of billable hours on a defense to their unlawful and abusive actions.

174.   Additionally, because Marin expected to make $165,000 a year at Congress for two years,   and these defendants unjustifiably stopped plaintiff, Marin is also entitled to "expectation" damages of $350,000   for two lost years in Congress from 2015 to 2017.

175.   Additionally, because these same Defendants used the same unlawful state statutes to serve Marin at a residence in Erie, PA in 2012 when PASCAL admitted in state court on April 10 that he knew Marin was not there, with the same challenge and had Marin removed from the ballot

for Congress in 2012 before Marin knew that a challenge had been filed, a jury is entitled to infer Marin would have won the election in November 2012 but for the deceit of these defendants, making Marin  is also entitled to congressional wages of $165,000 a year for the period 2013 to 2015.

176.   Because Marin reasonably expected to be re-elected for 20 years, he is also entitled to "expectation" damages of $3.9 million for a lost career in Congress.

177.   WHEREFORE, Marin seeks and is entitled to an award of $1,800 in "out-of-pocket" costs for time and money spent before the state action which can never be recovered, $108,000 for time and money spent to try to stop their attacks, for $ 3.9 million in lost congressional wages, and for $3 million for punitive damages against each Defendant named in this particular claim.

## SIXTH   CLAIM   FOR   DAMAGES
## FOR  DEFAMATION
## AGAINST   CHARLES   RICE  AND  CHARLES   ANTHONY   PASCAL

178.   Marin hereby incorporates all prior allegations into this one.

179.   The newspaper story given by RICE to the Meadville newspaper falsely stated that the challenge against Marin was based on duplicate signatures or several people signing their names twice, which implies the crime of fraud.

180.   That implication automatically permits an action for defamation, according to the United States Supreme Court in Paul v. Davis, 424 U.S. 693, 697, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)(imputing criminal behavior to an individual is generally considered defamatory *per se*, and actionable without proof of special damages)

181.   Because PASCAL admitted to the state court on the record on April 10, 2014 that the challenge against Marin was not based on Marin submitting duplicate signatures and that the representation of RICE to the Meadville newspaper was false, RICE is bound by that admission because he held out PASCAL to be his attorney, according to Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).

182.   RICE knew at the time he published the story that it was false because RICE drafted

and verified the complaint against Marin in early March before he made the false statements about the content of the complaint in late March 2014.

183.   Because RICE knew at the time that he published the story that it was false or published it with reckless disregard of the truth, and alone that establishes malice according to the court of appeals to this federal court in Tucker v. Fischbein, 237 F.3d 275 (U.S. Court Of Appeals For The 3d Federal Circuit 2001).

184.   Establishing malice eliminates any good faith defense of any person attacking a political candidate in the media, and permits general and punitive damages against the person making the false statements.

185.   WHEREFORE, Marin seeks and is entitled to an award of  $ 3.9 million in lost congressional wages, and for $3 million for punitive damages against each Defendant named in this particular claim.

## SIXTH   CLAIM   FOR   DAMAGES
## FOR   VIOLATION   OF   THE   CIVIL   RIGHTS   ACT
## (42   U.S.C. § 1983)
## AGAINST   COMMONWEALTH   SECRETARY

186.   Marin hereby incorporates all prior allegations into this one.

187.   This court has personal jurisdiction of all the defendants in this cause of action because they acted in concert and cooperation with Harrisburg resident ACHIELE from her office in Harrisburg, in using their powers under color of state law to intentionally, maliciously, and unlawfully deprive Marin of his 1st and 14th Amendment rights and to interfere with Marin's career without lawful   justification.

188.   The effect of removal of the state challenge against Marin to the federal court was to end the authority of the state court to hold any trial, or to issue any order, making anything produced no more than a piece of paper without legal power, according to Security Farms v. International Broth. of Teamsters, 124 F.3d 999 (9th Cir. 1997)(a state proceeding is extinguished by the removal

to federal court).

189.   The SECRETARY  OF THE  COMMONWEALTH AICHELE was given a copy of the same removal notice on April 8, 2014 by delivery to her office at Strawberry Square in Harrisburg, and was also informed by the same notice being published by the Commonwealth Court on April 8, 2014 in its public court record.

190.   Because the law is clearly established for a century that a removal to federal court ends the authority of the state court, AICHELE is deemed by law to know that rule under the fair warning doctrine of Hope v. Pelzer, 536 U.S. 730, 731 (2002).

191.   Therefore, when the state judge published a paper on April 14 that   purported to direct AICHELE to remove Marin from the ballot, because the case was still in the federal court on April 14, 2014, AICHELE knew or should have known that the paper of the state judge was not an order but was only a paper with no authority.

192.   Nevertheless, with knowledge that the state judge did not issue any order on August 14, 2014, AICHELE reported on the Pennsylvania state elections computer site that Marin was no longer a candidate for Congress, and thereafter represented to all persons that a court order had removed Marin from the ballot when she knew that was not true because the only court with power over Marin's nomination on April 14 was the federal court and that court made no such order then or at any time.

193.   Therefore, AICHELE intended to publish false information about Marin to hurt Marin which was not true and which she knew was not true at the time she published it.

194.   That act eliminated any immunity that AICHELE might have otherwise had and made her personally liable for Marin's injuries under the rule in Helstoski v. Goldstein, 552 F.2d 564, 566 (3rd Cir. 1977) (destroying immunity when state agent willfully inserted false information into record that harmed the litigant).

195.   That false publication was then relied upon by the election directors and each of the county commissioners and councilmen of each of the seven counties listed in this cause of action, and they took Marin's name off the ballot for the Democratic Primary for May 20, 2014.

196.   However, at the time they took that action, the counties speaking through their county

commissioners and councilmen actually knew the report of AICHELE was false because their representatives WENDY BUZZARD, KIMBERLY DELAND, ED   ALLISON, and JEFFREY GREENBURG and the attorney TOM   LESLIE, were actually in the state courtroom on April 10, 2014 in Pittsburgh at 10am, when the state judge acknowledged that Marin had removed the state action to federal court, and they heard Marin say the state court no longer had jurisdiction.

197.   Because under the fair warning doctrine all of these county officials are deemed to know the established law just as is the SECRETARY OF THE COMMONWEALTH, each of these persons could not claim to have relied upon the notice of AICHELE that Marin was   eliminated from the race by an order of the state judge since they all knew the action was removed to federal court because that judge said so that morning, and they are deemed to know the effect of removal to federal court makes any order of the same judge void so as a matter of law Marin was *not* removed from the race by the order of any court; leaving all of them without any immunity for good faith mistakes of government officers because they knew that AICHELE'S report was false.

198.   Additionally, these same representatives of the local officials heard the state judge bar Marin from introducing any evidence for his own defense which Marin had a right to do anytime before trial, to punish Marin for removing the state action to federal court, making the state trial of April 10 and order of April 14 void for violation of Marin's due process rights because of the rule in Bordenkircher v. Hayes 434 U.S. 357, 363,   98 S.Ct. 633, 668 [3](1978)   ("Penalizing a person for doing what the law plainly allows him to do is violation of due process of the most basic sort."). And, therefore, they knew or should have known that the state trial and April 14 order were void for a second reason.

199.   Additionally, these same persons heard the judge refuse to continue the trial so Marin could collect records from the state offices, and they heard him quash all of the subpoenas that Marin had served on state offices to prove the disabled really were disabled, on the grounds that there was not enough time, which is another basis making the state trial of April 10 and order of April 14 void for violation of Marin's due process rights even if that state judge did have continued jurisdiction, because the refusal to allow a candidate to collect evidence for his defense due to short periods allowed for candidates for defense by state legislatures is also a violation of due process according to

Briscoe v. Kusper, 435 F.2d 1046, 1055-57  (7th Cir. 1970).    And, therefore, they knew or should

have known that the state trial and April 14 order were void for a third separate reason.

200.    Additionally, these same defendants heard the judge refuse to dismiss and stop the trial

on April 10 on the additional grounds raised by Marin that the challenger unlawfully attacked all of

the disabled nominators where the challenger had failed to allege in his initial challenge that the

disabled   were not disabled as a challenger must do in order to continue the challenge according to

Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth. 2003).    Thus, the

process of the state judge changing an established rule without giving candidates advance notice

made the state trial and April 14 order void according to Briscoe v. Kusper, 435 F.2d 1046, 1055-57

(7th Cir. 1970)(state nomination petition process that invalidates signatures for failing to include

middle initial which is a change in established procedure and fails to give advance notice to

candidates of that change in regulations or interpretation of law, constituted denial of due process ).

And, therefore, they knew or should have known that MCGINLEY's trial and April 14 order were

void for a fourth separate reason.

201.    Additionally, these same persons received notice of the state judge's supposed order of

April 14, 2014 which stated that the state court was not going to follow the established rule any more

that a candidate may print information in boxes of the disabled as expressly permitted by the same

court in Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth. 2003), if

there are more than 12 disabled, which also constitutes a failure to give a candidate advance notice

of a change in the rules that resulted in the elimination of 250 of Marin's nominators and which

made the April 14 order void for a fifth separate reason, according to   Williams v. Sclafani, 444

F.Supp. 906, 912-13 at [6](S.D.N.Y. 1978)(because the   elections Board established a practice of

allowing nomination signatures in a certain way, the candidate justifiably relied on it and that

process "could not be departed from without giving prior notice to potential candidates" ).      .

202.    Additionally, Marin expressly notified AICHELE by an additional letter delivered in

person by Marin to the SECRETARY at her office in Harrisburg on   April 29, 2014, followed by

his   mailing of the same certified mail notice, that her notice that Marin was ordered removed by the

state court, was false because of the removal to federal court, and he demanded that she send a

correction   notice to all counties to put Marin's name back on the ballot, and she refused.

203.   Additionally, Marin sent all the county election directors named in this cause of action on May 8, 2014 by certified U.S. Mail seven (7) additional notices that Marin was not ordered off the ballot by any court and that the state judge had no power because of the removal to federal court, and he demanded that they put his name back on the May 20 ballot immediately, and they all refused, knowing they were continuing to violate Marin's 1st and 14th Amendment rights because Marin said so in the seven letters.

204.   Additionally, on May 10 Marin sent seven more notices to all of the counties named in this cause of action and to all of the country commissioners and councilmen, a similar letter demanding that they direct their election director to put Marin's name back on the ballot, as well as this law suit with their names in it to show they continue to violate Marin's rights and their failure to act must be considered by a jury to amount to intentionally malicious conduct or deliberate indifference, and all of them also refused to act.

205.   In the same letters Marin also cited that court rule that they may not rely on the acts of state officers and follow state guidance when they knew that guidance was false or unlawful, and Marin cited these cases.   Here they are again:   Helstoski v. Goldstein, 552 F.2d 564, 566 (3rd Cir. 1977) (destroying immunity when state agent willfully inserted false information into record that harmed the litigant);   Lee v. City of  Hartford/ Hartford Public Schools, 289 F.Supp.2d 25, 29 (D. Conn. 2003)(city is liable even if a supervisor acted "in the teeth of the city policy" when it was in conflict with federal law).

206.   Nevertheless, all of them refused to correct the deliberate mistake of AICHELE, and refused to put Marin's name back on the ballot when they knew he should have been on the ballot for May 20.

207.   Therefore, none of the county officers named in this cause of action has any immunity since they deliberately removed Marin's right to run for public office when they knew they had no right to do so, or they refused to put Marin's name back on the ballot after they became aware that they had no right to take his name off, and after they had 19 different notices that the state order of April 14 was   void.

208.   An injured person makes a good claim for violation of the Civil Rights Act (Title 42 United States Code, Section 1983), then the injured person alleges he was deprived of a property or liberty interest under color of state law and without due process.

209.   The right to campaign for Congress is a 1st Amendment right:

> [E]very citizen shall have the right to engage in political
> expression and association which right was enshrined in the
> 1st Amendment of the Bill of Rights. . ..   Associational rights
> include activities pursued in the cause of a campaign for public office.

Barker v. State of Wisconsin Ethics Bd., 841 F.Supp. 255, 258 (United States District Court for the Western District of Wisconsin 1993).

210.   The denial of 1st Amendment without due process rights constitutes a denial of a liberty or a property right without due process, according to Lynch v. Household Finance Corp., 405 US 538, 542, 92 S. Ct. 1113, 31 L. Ed. 2d 424 (1972)("This Court has never adopted the distinction between personal liberties and proprietary rights" in civil rights cases), and Pearl Inv. Co. v. City and County of San Francisco, 774 F.2d 1460, 1463 [3] (9th Cir. 1985)(the Civil Rights Act protects property rights no less than individual liberties).

211.   Here, due process required that the federal court be permitted to decide the case and Marin had a right to remain on the ballot on May 20, 2014 unless the federal court ruled otherwise.

212.   That elimination of Marin, therefore, violated Marin's rights to have a trial for the nomination challenge by a court with jurisdiction to do so, and to be allowed to run for Congress, according to Mark v. Borough of Hatboro, 51 F. 3d 1137, 1141 (3d Federal Circuit Court of Appeals 1995)(deprivation of any federal constitutional right allows a claim under the Civil Rights Act).

213.   However, that process was denied by AICHELE acting under color of state law because her false report was published under the state's name in the state computer program for all the   world to see, to hurt Marin, and that allows Marin to sue her and all who acted with her to deprive   Marin of those rights, according to WB v. Matula, 67 F. 3d 484, 493 (3d Cir. ("in a § 1983 action a person may challenge federal statutory violations by state agents").

214.   Additionally, the act of all of the county officers to take Marin's name off the ballot or

by itself their subsequent refusal to put Marin's name back on the ballot after Marin sent them legal notices showing that they made a serious and dangerous mistake, also constituted acts under color of state law even though they were done by counties and county officers because counties and their officers act under powers given by the state, according to the U.S. Supreme Court in   West v. Atkins, 487 U.S. 42 (1988) (person acts under color of state law when he abuses power given by state).

215.   Their acts of AICHELE to remove Marin and to refuse to put his name back on the ballot after AICHELE and the county officers knew or should have known that they were not entitled to follow the false report of AICHELE, constituted deliberate and malicious acts intended to hurt Marin by preventing him from spending time to campaign and forcing him to draft legal papers full time, and to deny his 1st Amendment constitutional right to run for office, and to end his congressional career.

216.   Those deliberate acts made each of the defendants in this cause of action liable for violating Marin's constitutional rights regardless of the actual "out-of-pocket" cost to Marin, according to Baker v. National State Bank, 353 N.J. Super. 145, 165, 801 A.2d 1158, 1170 (2002)($1.8 million verdict for violation of substantive due process rights upheld regardless of  the actual loss to plaintiff).

217.   And they made each of the defendants in this cause of action liable for the loss of Marin's entire congressional career, according to Gold v. Los Angeles Democratic League, 49 Cal. App. 3d 372, 375 [13], 122 Cal.Rptr. 732, 739 (1975)(good claim for interference with chance of running for city controller even though he had no track record in that office . . . and was then stopped) and Warren v. Greenfield, 595 A.2d 1308, 1314 (Pa. Super. 1991) (the fact that   plaintiff's business was "new and untried" does not prevent the plaintiff's losses from being foreseeable).

218.   The unlawful removal of Marin from the run for Congress and their refusal to Marin back on the ballot in time for the May 20 primary election was an actual or "proximate" or substantial cause of Marin's inability to get elected, since he must be on the ballot to be elected, because the "last-ditch" step of trying to be a write-in candidate is neither realistic nor meaningful and cannot be counted as a fair alternate means to get elected to Congress, according to the United

States Supreme Court in <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 806, 103  S.Ct. 1564, 1578, 75 L.Ed.2d 547, 799 n. 26 (1982)(a  write-in chance for missing a nomination deadline with a major party "is not an adequate substitute for having the candidate's name  appear on the printed ballot").

219.   It is not necessary for a jury to find these refusals were the *only* reason for Marin's inability to become a congressman, for this jury to award Marin a substantial amount for the loss of the career or the denial of his 1st Amendment right to run or his 14th Amendment right of due process.    Instead, a jury can find Marin might have lost for any other reason like poverty or platform, and still award Marin fully if it is satisfied that *one* of the reasons for that loss was the wrongful conduct of these  defendants and the jury alone makes that decision, according to the appeals court to this court in <u>Scirex Corp. v. Federal Ins. Co.</u>, 313 F.3d 841,  849-50 (3d Cir. 2002)(the direct cause of a loss "does not have to be the sole cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be a proximate or substantial cause" of the loss to allow a damages award).

220.   And a jury may award both compensatory and punitive damages for violations of the Civil Rights Act, even if they involve a deprivation of due process rights without any actual monetary loss, according to <u>WB v. Matula</u>, 67 F. 3d 484, 495   (3rd Cir. 1995)(compensatory and punitive damages are available under a Civil Rights Act claim, even for deprivation of due process alone).

221.   Because Marin reasonably expected to be re-elected for 20 years, he is entitled to compensation damages of $3.9 million for a lost career in Congress.

222.   Because Marin spent $1,800 in "out-of-pocket" costs for time and money before the May 20, 2014 election which can never be recovered, and $108,000 for time spent to try to stop their attacks and get back on the ballot, he is entitled to an award of this amount as well.

223.   And, in the event they claim mere negligence rather than deliberate acts after refusing 19 requests to restore Marin to the ballot, they are still guilty because their repeated refusals to correct  their mistake amounts to deliberate indifference to the deprivation of Marin's constitutional rights as well  as malice intended to hurt Marin, he is also entitle to punitive damages against each person, but not against the counties, under the rule in <u>Colburn v. Upper Darby Township</u>, 838 F.2d

663, 670, n. 4 (3d Cir. 1988)("gross negligent conduct creates a strong presumption of deliberate indifference") and Palone v. City of Frederick, 787 F.Supp.2d 360, 387 (D. Md. 2011)(plaintiff's assertions that repeated refusals for accommodation constituted deliberate indifference is a question for the jury not to be resolved by summary judgment).

224.   WHEREFORE, Marin seeks and is entitled to an award of $1,800 in "out-of-pocket" costs for time and money spent before the state action which can never be recovered, $108,000 for time and money spent to try to stop their attacks, for $ 3.9 million in lost congressional wages, $3 million for the denial of the 1st Amendment right alone even without a proof of actual costs, and for $3 million for punitive damages against each defendant named in this particular claim, not counting the counties themselves since counties may not be sued for punitive damages but their commissioners and officers may.

225.   These allegations are verified.


DATED:   July 15, 2015



Marin
3900 Dawnshire Dr.
Parma, OH 44134